820 A.2d 1 (2003)
359 N.J. Super. 249
STATE of New Jersey, Plaintiff-Respondent,
v.
Wayne PILLAR, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 11, 2002.
Decided March 11, 2003.
*5 Peter A. Garcia, Acting Public Defender, attorney for the appellant (Alfred V. Gellene, Designated Counsel, on the brief).
Peter C. Harvey, Acting Attorney General, attorney for respondent (Adrienne B. Reim, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, EICHEN and WEISSBARD. *2 *3
*4 The opinion of the court was delivered by WEISSBARD, J.A.D.
In this child sexual abuse case we are constrained to reverse defendant's conviction due to the improper admission of a highly incriminating statement made by defendant to police at the time of his arrest. We conclude that the statement, made immediately following administration of Miranda[1] warnings and after an assurance from an officer that defendant could make a statement "off-the-record," was not only obtained in violation of Miranda but was involuntary. We hold, as well, that a statement concerning the offense made by one of the victims to a physician who examined the victim at the request of investigating authorities was also inadmissible. Finally, we conclude that the admission of defendant's statement, either alone or in conjunction with the physician's testimony, cannot be deemed harmless in the circumstances of this case, which turned on defendant's credibility weighed against that of the victims.
On September 21, 1998, a Middlesex County grand jury returned an indictment charging defendant Wayne Pillar with two counts of first degree aggravated sexual assault of P.T. and S.A.T., N.J.S.A. 2C:14-2a (counts one and six, respectively); three counts of second degree sexual assault, two involving P.T. and one, S.A.T., N.J.S.A. 2C:14-2b (counts two, three and seven); two counts of third degree endangering the welfare of a child involving P.T. and S.A.T., N.J.S.A. 2C:24-4a (counts four and eight, respectively); and one count of second degree endangering the welfare of a child, involving P.T., N.J.S.A. 2C:24-4b(4) (count five). P.T., was born on August 23, 1983. S.A.T., P.T.'s sister, was born on May 7, 1979.
The indictment alleged that defendant engaged in various acts of sexual abuse of P.T., between January 1, 1991 and August 22, 1996. The incidents allegedly took the form of fondling, digital and genital penetration, and oral sex. With respect to S.A.T., it was alleged that defendant sexually assaulted her sometime between May and September 1991 by touching her improperly when she was under the age of thirteen.
*6 The jury acquitted defendant of count three, involving an allegation of sexual assault by penetration with P.T. between August and September 1996 when P.T. was over thirteen, as well as count six, an allegation of aggravated sexual assault by penetration with S.A.T. between May and September 1991 when she was under thirteen. He was convicted on the remaining counts.
On October 13, 2000, defendant was sentenced to a twelve-year prison term on count one (aggravated sexual assault), a seven-year term on counts two and seven (sexual assault), a four-year term on counts four and eight (endangering), and a five-year term on count five (endangering). The terms imposed on counts two, four, five, seven and eight were to run concurrent with the sentence on count one.
In 1976, defendant, who was thirty-nine years old, befriended J.T. and M.T., the parents of P.T. and S.A.T. Shortly thereafter, M.T. and defendant began a sexual relationship. In fact, both M.T. and defendant believe that defendant is the biological father of S.A.T. Defendant was P.T.'s godfather as well.
In 1982, defendant moved to Florida. However, he would call M.T. and visit the family occasionally, staying at their household during these visits. Three years later, defendant returned to New Jersey and lived with the family for another three years. In 1988, defendant moved back to Florida but continued to visit the family two or three times a year. When he did visit, he slept in P.T.'s room, while P.T. slept on the couch.
Defendant would purchase gifts for P.T., a child who had attended a special school since she was four years old and was eventually classified as emotionally disturbed. When P.T. was seven years old, however, defendant began to touch "[her] vagina and breasts ... underneath [her] clothing." These incidents would occur when P.T.'s parents were at bingo, which was nearly every night, and mostly when S.A.T., P.T.'s older sister, was out of the house, although several instances occurred with the sister present in the house. P.T. complained to M.T. about defendant's conduct, specifically that defendant was "hurting her," but her mother did nothing. Defendant eventually forced P.T. to touch his penis. Defendant would also give alcohol to P.T. until she became intoxicated. The two would also watch pornographic movies together, during which defendant would begin masturbating himself and touching her. Defendant also forced P.T. to give him oral sex "a couple of times," gave her drugs, and also took suggestive photographs of her in her underwear; pictures which defendant had developed and kept. Eventually, when P.T. was around ten or eleven, defendant penetrated P.T. with his penis, although P.T. yelled for him to stop. There were two incidents of vaginal penetration. On more than one occasion, defendant tied P.T.'s hands and feet during the assaults.
When defendant was not in New Jersey, he would call P.T. every Friday night or send her letters, both sexual in nature. On one occasion around Christmas, defendant sent P.T. a box of CDs with a letter noting that it was to be opened only by P.T., "Confidential. For your eyes only. Top Secret." The letter stated in pertinent part:
[A]nd also a gift certificate for a pair of pants to cover your sweet little ass. This way you can get the style that you like and not one that I think looks best on you. That can wait until I get there, and take you shopping if your [sic] good to me.... I plan on cumming up at the end of March, so you can start getting ready now. I know you finally got [S.A.T.] thrown out, and I hope that you *7 are not to [sic] lonely without someone to fight with.... I'm hoping that you and D. will throw me a little tea party when I'm there. I will bring a movie for us three to watch, and maybe all 3 of us can learn something and have fun doing it together.
Defendant also sent P.T. a letter indicating that he would give her certain things if she did certain things, such as "a lap top computer which he said he might get [her] if [she] had sexual intercourse with him." This letter, which P.T. described as a "price list," stated in part:
Just a short little letter about our phone call on Friday. You wanted to know about present values. So here is a price list. Under $5 lunch or snack money but be careful because they add up. $5 to $15 about the cost of the bra. This also should cover a CD. $15 to $30.00, this will buy a pair of pants and a shirt. Will also get dinner. $30 to $60 this is the almost everything price range. Should uncover everything and taste new experiences and one or two other small gifts over $60. This is the all the way gift, no stopping. Doing everything. It also includes a role of film for Mom's Polaroid camera.
P.S. $1300, new computer. Hey, I'd have to fuck someone every night to buy one of those.
Defendant's behavior ceased when P.T. turned fourteen. The last incident involved defendant forcing P.T. to have intercourse and stating "if [P.T.] tell[s] anybody, [she's] going to get it." Defendant allegedly fondled one of P.T.'s friends as well, although he was not charged for that offense.
In 1992, defendant also inappropriately touched P.T.'s older sister, S.A.T. on several occasions. In one instance, when S.A.T. was twelve, defendant penetrated S.A.T.'s vagina with his finger. S.A.T. told her mother, who did not believe her. Several days later, defendant began to rub her inner thigh while the two were driving to a mall. S.A.T. "pushed his hand away," told him to stop and sat in the back for the trip home. S.A.T., who was dating a man twenty years older than her (whom she later married), moved out of the house in 1998 because she did not get along with her mother.
In 1997, C.L., a friend of the T.'s, moved into the T.'s residence upon being evicted from her own home. C.L. got along well with P.T. and S.A.T., eventually becoming J.T.'s girlfriend. On March 19, 1998, while tucking P.T. in for bed, C.L. noticed a crumpled piece of paper on the floor of P.T.'s bedroom. She picked up the paper and read it, noticing that the letter was from defendant. The next day, in response to questioning about the letter, P.T. told C.L. that "[defendant] had touched her" and asked her not to tell J.T., her father. C.L. then spoke with S.A.T., who also related defendant's conduct with her. C.L. then told J.T. of the allegations.
C.L. looked around the house and found other letters from defendant. On Monday, she called P.T.'s school, and J.T. called the police. A week later J.T., S.A.T., and P.T., met at P.T.'s school with Investigator Allan Bandics. Investigator Bandics took statements from both girls, in the presence of a school counselor, and Marcia Gonzalez, a representative from the Division of Youth and Family Services. Complaints were signed shortly thereafter and on July 12, 1998, the next time defendant came to New Jersey from Florida, he was arrested.
Prior to trial, the judge held an N.J.R.E. 104(a) hearing to determine the admissibility of out-of-court statements made by defendant to the police following his arrest. The judge admitted the statements, finding them to have been made voluntarily. *8 The judge also admitted, based on stipulated facts, out-of-court statements made by P.T. and S.A.T. to C.L., concerning the sexual acts allegedly committed upon them by defendant, under the "fresh complaint" rule.
Both P.T. and S.A.T. testified at trial to the various acts of sexual abuse committed by defendant. In addition, the jury heard certain incriminating statements made by defendant, which we will discuss hereafter. The jury also reviewed the letters written by defendant to P.T.
Defendant testified in his own behalf, denying that he had ever touched P.T. or S.A.T. in an inappropriate manner. He explained that the letters written to P.T. were meant as jokes, conceding that, in hindsight, they contained inappropriate language. He acknowledged that he had a habit of making coarse sexual jokes that people might find offensive and admitted engaging in such sexual banter with P.T. and S.A.T.

I
We first address the admissibility of an incriminating statement made by defendant after his arrest.

A.
On July 12, 1998, defendant was arrested as he arrived at P.T.'s home on a visit from Florida. Investigator Bandics read defendant the charges contained in complaints signed by S.A.T. and J.T., P.T.'s father, and verbally advised him of his Miranda rights. Defendant acknowledged that he understood his rights and asked no questions at that time. After transporting defendant to the police department, Bandics read the rights again, and defendant signed a Miranda warning card. Once again defendant acknowledged that he understood his rights and asked no questions.
After being photographed and fingerprinted, defendant was escorted into a conference room where he was given the criminal complaints to read for himself. At that point, Bandics asked defendant if he wished to speak. Defendant responded that he was "guilty of some of the things on here ... but not all of them." Defendant then stated that he would like to speak to the police, but would "like to consult with an attorney first." Defendant asked what would happen to him next, and Bandics told him about the arraignment process, setting of bail and appointment of counsel, if necessary. When asked if he had any questions, defendant paused for a moment, and asked to "say something `off-the-record.' " Both Bandics and Detective Zebrowski, who was also in the conference room, agreed to listen to an "off-the-record" statement. At this point, defendant stated "that he fondled these girls [referring to P.T. and S.A.T.] but did not penetrate them." Bandics testified that he was not sure what "off-the-record" meant, but he was "under the impression that [defendant] wanted to tell me something." Bandics conceded that in his mind once an individual receives Miranda warnings, "there really is no such thing as off-the-record." After defendant made the "fondling" admission, Bandics asked if "he wanted to talk about anything else." Defendant responded that he "thought it would be best if he could speak to an attorney first." The conversation then ended.

B.
Before the trial court, defense counsel argued that the police officers' consent to listen to "off-the-record" statements was misleading, which caused defendant's incriminating statements to be coerced, in *9 violation of his Fifth Amendment rights. The State countered that defendant was well aware of his right to remain silent, and that he knew that he was entitled to confer with counsel. The State also argued that "off-the-record" was ambiguous to reasonable people such as the police officers to whom the comment was addressed.
The trial judge determined that defendant's first statement that he was guilty of some of the charges, was not a product of interrogation, and that, in any event, it was voluntarily made because defendant was cognizant of his constitutional rights when he made it. The judge also determined that the second statement, made after defendant requested to speak "off-the-record," was voluntarily made for the same reason, and because the officers' conduct was "not unreasonable." Hence, the judge denied defendant's motion to suppress the statements, both of which were subsequently heard by the jury.
On appeal defendant does not challenge the ruling with respect to his initial statement, but contends that the second, "off-the-record," statement was not admissible because "it was misleading and false." Although defendant primarily attacks the statement on the ground that it was involuntarily made, he also argues that the police conduct in obtaining the statement subverted the Miranda warnings themselves. Because the two arguments are "intertwined," Reynolds v. State, 327 Md. 494, 610 A.2d 782, 785 (1992), cert. denied, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993), we address the admissibility of defendant's statement both in terms of a Miranda violation, as well as on traditional grounds of voluntariness. However, we note, as did the court in Reynolds, supra, at 785-86, that appellate counsel have an obligation to carefully isolate and identify the separate legal bases of their arguments and to include them in distinct point headings. R. 2:6-2(a)(5).

C.
As is now well known, in Miranda, the United States Supreme Court prescribed procedures that law enforcement must follow in an effort to protect a criminal suspect's Fifth Amendment privilege against self-incrimination. The Miranda rights "are ancillary to the fundamental right that is at the core of the Fifth Amendment." State v. Burris, 145 N.J. 509, 518, 679 A.2d 121 (1996) (citing Oregon v. Elstad, 470 U.S. 298, 304, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222, 229 (1985)). The Miranda warnings are not themselves rights protected by the Constitution but are, rather "prophylactic measures that are necessary to safeguard the essential constitutional right against self-incrimination." Ibid.
Because the Miranda warnings are prophylactic measures designed to ensure that a suspect's decision to speak to the police is knowing and voluntary, a Miranda violation itself is not determinative of a Fifth Amendment violation of the privilege against self-incrimination. [Michigan v. Tucker, 417 U.S. 433, 444-45, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182, 193 (1974)]. A voluntary, incriminating statement elicited without the Miranda warnings violates a defendant's ancillary rights, but does not rise to the level of a constitutional violation. Id. at 446, 94 S.Ct. at 2365, 41 L.Ed.2d at 194. A statement that is elicited after a Miranda right has been invoked, however, becomes a violation of constitutional dimensiona violation of the constitutional right itself. Wainwright v. Greenfield, 474 U.S. 284, 293, 106 S.Ct. 634, 639, 88 L.Ed.2d 623, 631 (1986).
*10 [Id. at 519, 679 A.2d 121.][2]
The distinction between violation of a prophylactic rule and violation of a constitutionally guaranteed right is significant because of the consequences that flow from each. There is "a qualitative difference between a failure to administer Miranda warnings in the first place, and a failure to honor, after they have been asserted, the constitutional rights that those warnings are designed to secure." State v. Hartley, 103 N.J. 252, 272, 511 A.2d 80 (1986). Thus, a statement resulting from an in-custody interrogation without Miranda warnings may nevertheless be voluntary. Ibid. As a result, such a voluntary, though unwarned statement, while inadmissible in the prosecution's case-in-chief, may be used for impeachment of the accused if he testifies. State v. Burris, supra, 145 N.J. at 529, 679 A.2d 121.[3] On the other hand, an involuntary statement is inadmissible for any purpose. Id. at 534, 679 A.2d 121; Mincey v. Arizona, 437 U.S. 385, 397-98, 98 S.Ct. 2408, 2416, 57 L. Ed.2d 290, 303-04 (1978); United States v. Walton, 10 F.3d 1024, 1033 (3rd. Cir.1993).

D.
We first address the impact of an agreed to request to speak "off-the-record" following administration of Miranda warnings. There are two bases upon which such an agreement renders the resulting statement inadmissible. First, such a misrepresentation directly contradicts and thereby neutralizes the entire purpose of the Miranda warnings. Second, such misrepresentation, may, and in this case did, render the statement involuntary. We deal with the Miranda issue first.

(1)
In People v. Braeseke, 25 Cal.3d 691, 159 Cal.Rptr. 684, 602 P.2d 384 (1979)[4], the defendant was taken to a police station to be interviewed concerning the killings of his mother, father and grandfather. After an initial period of questioning, the police decided to reinterview defendant concerning inconsistencies between his story and that of another witness. Miranda warnings were administered and defendant indicated his willingness to speak *11 with the officers. However, after some further inconsistency developed, the police told defendant that they believed he had committed the homicides. "At this point defendant said he did not want to discuss the matter further without an attorney present." Id. at 386. Nevertheless, during subsequent booking procedure defendant asked if he could speak with one of the original interrogating officers alone and "off-the-record." The officer agreed and defendant made certain incriminating statements, which led to a tape-recorded confession. Id. at 386-87. The court held that a request to speak "off-the-record" cannot constitute a knowing and intelligent waiver of Miranda rights, specifically the advice that anything a suspect says can be used against him in a court of law. Id. at 391. "Indeed, defendant's request revealed a marked lack of understanding of the Miranda warnings. [The officers] then contributed to defendant's lack of understanding by agreeing to the request rather than informing defendant there could be no such thing as an `off-the-record' discussion." Ibid. (citations omitted)[5]
Similarly, in United States v. Walton, supra, 10 F.3d at 1027, the court was also faced with a defendant who sought an off-the-record interview with federal agents the day following administration of Miranda warnings and the providing of a written statement. The officer, who defendant knew from high school, assured defendant that they could talk "off the cuff," following which defendant provided inculpatory information. No Miranda warnings were given before this conversation.
At the outset, the court acknowledged that "[t]his is not a Miranda case," since Walton was not in custody when his statement was made. As a result, the admissibility of the statement was to be evaluated under a voluntariness standard judged by the totality of the circumstances. Walton, supra, at 1028. Although we shall discuss the voluntariness of defendant's statement later in this opinion, it is of significance that in finding the statement involuntary the Third Circuit noted that "there was no reason for Walton to disbelieve [the officer] that nothing he said would be used against him, and to rely instead upon the Miranda warnings he had been given the previous day. Indeed the Miranda warnings of the previous day and [the officer's] assurances during the park bench meeting appear exclusive of, and inconsistent with, one another." Id. at 1030. The officer's "assurances that Walton could speak `off the cuff' created a situation in which Walton was deprived of the ability to understand the consequences of foregoing his privilege [against self-incrimination]. A fortiorari, he was deprived of the ability to make an intelligent choice between exercising and waiving that privilege." Id. at 1031.
The same reasoning applies in the present case. Indeed, the infirmity here runs deeper. A police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given *12 out of the other. An acquiescence to hear an "off-the-record" statement from a suspect, which the officer ought to know cannot be "off-the-record," totally undermines and eviscerates the Miranda warnings, at least with respect to a statement made, as here, in immediate and direct response to the misleading assurance. As the Pennsylvania Supreme Court said in Commonwealth v. Gibbs, 520 Pa. 151, 553 A.2d 409, 411(Pa.), cert. denied, 493 U.S. 963, 110 S.Ct. 403, 107 L.Ed.2d 369 (1989), "[m]isleading statements and promises by the police choke off the legal process at the very moment which Miranda was designed to protect." We agree.
Even if we accept the trial judge's conclusion that the officer did not know what defendant meant by "off-the-record," a conclusion we consider implausible in light of the common usage of the expression, it was the officer's obligation to clarify what the statement did mean, especially in light of the officer's acknowledgment that in his mind there was no such thing as an "off-the-record" conversation. In the face of the Miranda warning just administered, there could not be a valid waiver of the right to remain silent without such a clarification. See United States v. Anderson, 929 F.2d 96, 100 (2nd Cir.1991) ("affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege"); see also Colorado v. Spring, 479 U.S. 564, 576 n. 8, 107 S.Ct. 851, 858 n. 8, 93 L.Ed.2d 954, 967 n. 8 (1987).

(2)
The second basis upon which we conclude that the statement is not admissible relates to voluntariness, which is a legal question requiring an independent appellate determination. See Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985); State v. Watford, 261 N.J.Super. 151, 162, 618 A.2d 358 (1992) (Havey, J.A.D., concurring)[6]. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson, supra, 530 U.S. at 444, 120 S.Ct. at 2336, 147 L. Ed.2d at 420. Although police misrepresentations are relevant in analyzing the totality of the circumstances surrounding a claim that a confession was involuntary, such "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge." State v. Cooper, 151 N.J. 326, 355, 700 A.2d 306 (1997), cert. denied, 528 U.S. 1084, 120 S.Ct. 809, 145 L.Ed.2d 681 (2000) (citations omitted). "Moreover, a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." Ibid. (citation omitted). Nevertheless, it has been held that a promise of immunity in the form of an assurance by police that a statement would not be used against an accused, or would be considered confidential, without more, renders the statement involuntary. United States v. Walton, supra; Ponticelli v. State, 593 So.2d 483, 488 (Fla.1991), judgment vacated on other grounds by, 506 U.S. 802, 113 S.Ct. 32, 121 L.Ed.2d 5 (1992); State v. McDermott, 131 N.H. 495, 554 A.2d 1302, 1305-06 (1989); People v. Tanser, 75 Ill.App.3d 482, 31 Ill.Dec. 414, 394 N.E.2d 616, 619-20 (1979); State v. Nash, 228 Neb. 69, 421 N.W.2d 41, 43-44 (1988). The argument is that allowing the State to use incriminating information obtained in reliance on a false promise *13 "would be to sanction governmental deception in a manner violating due process." State v. McDermott, supra, 554 A.2d at 1306. An unfulfilled promise by a law enforcement officer is indistinguishable from a misrepresentation. See United States v. Fisher, 700 F.2d 780, 783 (2nd Cir.1983).
The doctrinal underpinning for the conclusion that statements made in reliance upon an official promise of favorable treatment are inadmissible is contained in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).[7] In that case, the Supreme Court stated that the "legal principle by which the admissibility of the confession of an accused person is to be determined" is that
a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.... A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.
[Id. at 542-43, 18 S.Ct. at 186-87, 42 L.Ed. at 573 (quoting 3 Russell on Crimes, 478 (6th ed. 1896)).]
In the course of finding that the statement at issue had not been made voluntarily, the Court held that "the impact of the conversation" between the defendant and the police officer was not to be considered "from a mere abstract point of view, but by the light of that it was calculated to produce on the mind of the accused, situated as he was at the time the conversation took place." Id. at 564, 18 S.Ct. at 195, 42 L.Ed. at 581.
In United States v. Pinto, 671 F.Supp. 41 (D.Me.1987), the court discussed at length the history and evolution of the Bram doctrine, noting that it "has never been modified or reversed" and continued, to the date of that opinion, "to be cited as controlling precedent on the voluntariness of confessions." Id. at 50. In particular, the court noted approving references to Bram in Malloy v. Hogan, 378 U.S. 1, 6-7, 84 S.Ct. 1489, 1492-93, 12 L.Ed.2d 653, 658-59 (1964), Miranda v. Arizona, supra, 384 U.S. at 461-62, 86 S.Ct. at 1621, 16 L.Ed.2d at 716, Brady v. United States, 397 U.S. 742, 754-55, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747, 759 (1970), and Hutto v. Ross, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194, 197 (1976) (per curiam). Nevertheless, what had once been considered virtually "a per se rule that promises or suggestions of leniency made to a defendant in the absence of counsel render any subsequent confession involuntary," Pinto, supra, 671 F.Supp. at 52 (citing Miller v. Fenton, 796 F.2d 598, 626-27 (3rd Cir.) (Gibbons, J., dissenting), cert. denied, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986)), see also United States v. Wolf, 601 F.Supp. 435, 441-42 (N.D.Ill.1984), has evolved into a totality of circumstances test in which any promises or threats by police officers are simply one factor to be considered. Pinto summarized the status of the case law as follows:
Modern cases look to the totality of the surrounding circumstances to determine the "voluntariness" of a statement. Notwithstanding the implication *14 in Bram that any promise taints a statement subsequently made, the more recent decisions consider a variety of factors, including the nature of the promise, see, e.g., [United States v. Robinson, 698 F.2d 448, 455 (D.C.Cir.1983)], the context in which the promise was made, see, e.g., Shotwell [Manufacturing Co. v. United States, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357, 363 (1963) ], the characteristics of the individual defendant, see Stein [v. New York, 346 U.S. 156, 185-86, 73 S.Ct. 1077, 1093-94, 97 L.Ed. 1522, 1543 (1953)], whether the defendant was informed of his rights see, e.g., Miller, [supra,] 796 F.2d at 609, and whether counsel was present, see, e.g., Brady, [supra,] 397 U.S. at 754, 90 S.Ct. at 1472, 25 L.Ed.2d at 759-60.

[Pinto, supra, 671 F.Supp. at 57.]
Judge Havey discussed the current status of Bram in his concurring opinion in State v. Watford, supra, 261 N.J.Super. at 160-64, 618 A.2d 358, noting that in Arizona v. Fulminante, 499 U.S. 279, 285, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302, 315 (1991), reh'g denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991), the Court expressly disavowed Bram as the standard for determining the voluntariness of a confession. Rather, the controlling test, the Court held, is that found in Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2046-47, 36 L.Ed.2d 854, 862 (1973), which asks whether, under the totality of circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker" or whether "his will has been overborne and his capacity for self-determination critically impaired." See also Green v. Scully, 850 F.2d 894, 900-01 (2nd Cir.1988), cert. denied, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988); State v. DiFrisco, 118 N.J. 253, 257-58, 571 A.2d 914 (1990); State v. J.G., 261 N.J.Super. 409, 424, 619 A.2d 232 (App.Div.), certif. denied, 133 N.J. 436, 627 A.2d 1142 (1993).[8] "Thus, the federal cases apparently focus, at least in part, on the clarity and certainty of the promise in determining whether, in the totality of the circumstances, the promise had the capacity to overbear the will of the defendant." State v. Watford, supra, 261 N.J.Super. at 163, 618 A.2d 358. And "[w]hether a statement by the interrogating officer amounts to a promise must be viewed from the defendant's, not the [interrogator]'s perspective, applying a reasonableness standard." Ibid. (citing Grades v. Boles, 398 F.2d 409, 412 (4th Cir.1968)).
Nor does the process of determining the impact of a promise on the voluntariness of a statement involve a quantitative weighing of the various factors set out in Schneckloth; rather, it is a qualitative weighing in which even a single factor may result in a finding that the "suspect's will was overborne and the confession was not therefore a free and voluntary act." Id. at 164, 618 A.2d 358 (quoting Green v. Scully, supra, 850 F.2d at 902). In Watford, Judge Havey took note, ibid., of the statement in Brady v. United States, supra, 397 U.S. at 754, 90 S.Ct. at 1472, 25 L.Ed.2d at 759, where, in an effort to distinguish Bram, the Court said:

Bram dealt with a confession given by a defendant in custody; alone and unrepresented by counsel. In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants *15 at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess.
In the present case, we examine the particular statement given by defendant, in custody, alone and without counsel, in specific and immediate response to the officer's assurance that defendant could speak off-the-record. That promise, which defendant could reasonably believe meant that the statement would not be used against him, clearly had the likelihood of stripping defendant of his "capacity for self-determination," Schneckloth, supra, 412 U.S. at 225-26, 93 S.Ct. at 2046-47, 36 L.Ed.2d at 862. "A promise that statements made will not be used against the defendant purports to remove the specter of proving one's own guilt by making a statement. Such a promise is a truly powerful one, going to the heart of a declarant's reservations about giving a statement." United States v. Conley, 859 F.Supp. 830, 836 (W.D.Pa.1994). We agree with the court's statement in Streetman v. Lynaugh, 812 F.2d 950, 957 (5th Cir.1987), reh'd denied, 818 F.2d 865 (1987), that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise ... that any statement will not be used against the accused is such a promise." (citation omitted). As the Court said in United States v. Walton, supra, 10 F.3d at 1031, an assurance that a statement would not be used against a suspect goes "beyond a direct promise of leniency." If defendant believed that his statement could not be used against him, despite the earlier Miranda warnings, his statement made as a result of that false assurance could not be a free and voluntary one. Stated differently, the improper promise "actually induced" the incriminating statement. State v. Cooper, supra, 151 N.J. at 355, 700 A.2d 306. In our view, the facts fail to establish that Pillar's statement was voluntary beyond a reasonable doubt. State v. Miller, 76 N.J. 392, 404-05, 388 A.2d 218 (1978).[9]
The cases relied upon by the State are all readily distinguishable. In State v. Henderson, 80 Hawai'i 439, 911 P.2d 74, 77 (1996), although the defendant asked to make an "off-the-record" statement after being advised of his Miranda rights, the officer told him that any statement he made would be "on the record." Nevertheless, defendant chose to speak. In the present case, rather than stating out loud that which was in his mind-that there could not be an off-the-record statement-Detective Bandics acquiesced in the request. In Carswell v. State, 268 Ga. 531, 491 S.E.2d 343 (1997), defendant's off-the-record denial of involvement in a murder came three hours before his ultimate confession at which point he had again received Miranda warnings. As the court said, "[a]t that point, Carswell could not reasonably have expected that his interrogation was being conducted off-the-record. Thus, Carswell's confessions were quite remote from, and not prompted by, the investigator's claim that they were speaking off-the-record...." Id. at 346.[10] Quite *16 the contrary is true here. In State v. McCray, 332 S.C. 536, 506 S.E.2d 301 (1998), cert. denied, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999), the court found that the officer's statement to the defendant that he was going to have an "off of the cup [sic] question and answer thing that we need to compile the evidence" did not constitute "police trickery" but was, rather, "clearly intended to convey the manner in which he planned to conduct his interview of [defendant]." Id. at 307.
Finally, in State v. Little, 201 W.Va. 523, 498 S.E.2d 716, 718-19 (1997), the administration of Miranda rights was tape recorded, after which defendant indicated that he did not wish to make a statement. The police officer turned off the recorder and left defendant alone with his mother and brother. After speaking with his family, defendant said he wished to make a statement. He then made a statement `off-the-record' "to which [the officer] replied that if defendant was telling the truth, his actions could be construed as self-defense." The recorder was then turned on again and defendant was reread his Miranda rights after which he admitted to shooting the victim. The West Virginia Supreme Court held the confession to be voluntarily given.
Those facts are so far afield from the circumstances present in this case as to provide no support for the State's argument. Here, to repeat, defendant's statement was in direct and immediate response to Bandics's knowingly incorrect representation that he could speak "off-the-record."[11] We do not hold that an off-the-record assurance continues indefinitely to render a statement made in response thereto involuntary. A statement made at a substantially later point in time might well be found voluntary notwithstanding the earlier false assurance.

E.
Despite finding that defendant's second statement was inadmissible, we must still determine whether the resulting error was harmless. R. 2:10-2; Arizona v. Fulminante, supra, 499 U.S. at 307-11, 111 S.Ct. at 1264-65, 113 L.Ed.2d at 329-33.[12]
*17 To state the harmless error test, at least with respect to constitutional errors, is easier than to apply it. In State v. Macon, 57 N.J. 325, 340-41, 273 A.2d 1 (1971), the Court adopted the Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-11 (1967) test that for a constitutional error to be harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." As Chief Justice Weintraub said in Macon, supra, at 340, 273 A.2d 1, "what continues to defy articulation is the process which leads a judge to say there is a doubt and that the doubt is or is not a reasonable one. The circumstances are too infinite and the appellate judgment too laden with discretion to admit a formulary aid." Another judge has aptly referred to the "chameleonic quality of harmless error methodology," State v. Evans, 96 Wash.2d 1, 633 P.2d 83, 88 (1981) (Brachtenbach, C.J., concurring), in apparent recognition of the distinct approaches employed by courts-and often by the same courts at different times-to determine if a given error is, or is not, harmless. The differing approaches appear to fall under two standards of review: "[t]he first, the contribution test, focuses on whether the error contributed to the verdict, that is, whether the evidence was likely to have been considered by the jury in arriving at its decision.... The second standard focuses on the remainder of the pie and permits a judicial finding of harmless error if the untainted evidence ... is so overwhelming that in the judgment of the reviewing court conviction was inevitable." Dennis J. Sweeney, An Analysis of Harmless Error in Washington: A Principled Process, 31 Gonz. L.Rev. 277, 286 (1996) (hereinafter Sweeney). See also State v. Evans, supra, 633 P.2d at 86-87. The contribution test is the "stricter of the two," being more "deferential to the party asserting the error." Sweeney, supra, at 287. Under that test, harmless error is error "which could not have `contributed' to the verdict." Sweeney, ibid. However, under either test a reviewing court must be able to "conclude that 12 jurors in a given case would have arrived at the same collective decision regardless of the error. To state this undertaking is also to state its impossibility." Sweeney, supra, at 291.
Even though Chapman and its progeny, such as Macon, would appear to have adopted the "contribution" test, Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969), decided just two years after Chapman, has been viewed by some as having adopted the "overwhelming evidence" test. See Harry T. Edwards, To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated, 70 N.Y.U. L.Rev. 1167, 1186 (1996) (hereinafter Edwards); State v. Evans, supra, 633 P.2d at 87. As a result, many appellate courts have adopted the analysis of the majority in Harrington, which looks to "whether the record evidence adequately demonstrates the appellant's guilt, rather than whether the error contributed to the verdict." Ibid. Notwithstanding, in Arizona v. Fulminante, supra, in finding that the coerced confession there was not harmless, the majority opinion on that issue appears to have reverted "to the likely impact of the error on the jury verdict in assessing the claim of harmless error." Edwards, supra, at 1189-90. That view was strengthened by *18 the decision in Sullivan v. Louisiana, 508 U.S. 275, 279-280, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182, 189 (1993), where Justice Scalia, speaking for the Court, concerning the proper harmless error analysis, wrote:

Chapman itself suggests the answer. Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered-no matter how inescapable the findings to support that verdict might be-would violate the jury-trial guarantee. (citations omitted).
And, finally, the Supreme Court confirmed its adoption of the contribution approach and its consequent rejection of the guilt-based analysis of harmless error in O'Neal v. McAninch, 513 U.S. 432, 115 S.Ct. 992, 130 L. Ed.2d 947 (1995).
Our courts have likewise at various times employed language suggestive of both approaches. As noted, Macon rather clearly adopted the contribution analysis of Chapman. See also Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173 (1963) ("The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"), discussed in Macon, supra, 57 N.J. at 339, 273 A.2d 1; and State v. Johnson, 46 N.J. 289, 291, 216 A.2d 392 (1966) (a pre-Macon decision, in which the Court said, with respect to an apparent non-constitutional error, "there must be an evaluation of its capacity for improper impact in the circumstances of a case"). In State v. Bankston, 63 N.J. 263, 272, 307 A.2d 65 (1973), the Court spoke in terms of a contribution approach, noting that the trial court's instructions "did not remove the prejudicial effect of that testimony from the minds of the jury." Yet, only a few lines later the Court appeared to have conflated the two approaches, stating: "We cannot say the proof was so overwhelming as to foreclose a real possibility that the jury gave decisive weight to the improper hearsay testimony." More recently, in addressing the cumulative impact of several instances of prosecutorial misconduct during trial, the Court said:
Even if the evidence were overwhelming, that could never be a justifiable basis for depriving a defendant of his or her entitlement to a constitutionally guaranteed right to a fair trial. The impact of violating a defendant's right to a fair trial cannot be measured by, or weighed against, the quantum of evidence bearing upon his or her guilt. (citations omitted).

[State v. Frost, 158 N.J. 76, 87, 727 A.2d 1 (1999).]
Yet, later that same term, in State v. Pepshi, 162 N.J. 490, 493, 745 A.2d 494 (1999), without any indication that it was consciously effecting a change in approach, the Court found certain non-constitutional error harmless "in light of the overwhelming evidence of guilt and the innocuous nature of the testimony." See also State v. Burton, 309 N.J.Super. 280, 289, 706 A.2d 1181 (App.Div.), certif. denied, 156 N.J. 407, 719 A.2d 639 (1998) ("evidence of defendant's guilt was overwhelming"); State v. Guzman, 313 N.J.Super. *19 363, 383, 712 A.2d 1233 (App.Div.), certif. denied, 156 N.J. 424, 719 A.2d 1022 (1998) (Observing that "[t]he State presented overwhelming evidence of defendant's guilt independent of [co-defendant's] statements [to police]").
Despite the sometimes inconsistent language, we conclude that, at least for constitutional errors, the correct approach seeks a determination of "what should have (as opposed to what did) or should not have (as opposed to what did not) influenced a jury in any given case. When so viewed, the analysis becomes less an exercise in judicial intuition, or second-guessing, and more of a reasoned application of a set of rules to a given fact pattern which ultimately results in the decision that the case will or will not be reversed." Sweeney, supra, at 282. We acknowledge that the contribution approach is not always an easy path to follow when, as here, there is overwhelming untainted evidence of defendant's guilt. "Indeed, [o]nly through a determined adherence to principle do we look beyond the weight of the evidence to the likely impact of an error." Edwards, supra, at 1192.
Notwithstanding the strength of the State's evidence, and the implausibility of defendant's explanation concerning his sexually suggestive letter to P.T., this case still turned on credibility. Having made the determination to testify, defendant was entitled to have his credibility judged by the jury without any improperly received evidence weighting the scales against him. Defendant's admission that he "fondled" the girls was just this type of proof. It strongly corroborated the victim's testimony and may have been an important factor in the jury's findings of guilt. As the Supreme Court noted in Fulminante:
A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."
[Fulminante, supra, at 499 U.S. at 296, 111 S.Ct. at 1257, 113 L.Ed.2d at 322 (quoting Bruton v. United States, 391 U.S. 123, 139-40, 88 S.Ct. 1620, 1629-30, 20 L. Ed.2d 476, 487 (1968) (White, J. dissenting)).]
As one commentator has noted, confessions are known to have a "profound effect" on juries, possessing "the potential to completely undermine the defense." Renfro, supra, at 590. "[I]nculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment." State v. McCloskey, 90 N.J. 18, 31, 446 A.2d 1201 (1982).
Thus, we find ourselves unable to conclude beyond a reasonable doubt that defendant's admission did not contribute to his conviction. Id. at 32, 446 A.2d 1201; State v. Bankston, supra, 63 N.J. at 273, 307 A.2d 65; State v. Macon, supra, 57 N.J. at 340, 273 A.2d 1; United States v. Walton, supra, 10 F.3d at 1032-34. The fact that defendant was found not guilty on some counts, suggesting that the jury did not rush to judgment, does not undermine our conclusion. We do not know the basis for the not guilty findings and cannot speculate; the "bottom line" remains that defendant was found guilty on most charges and his damning admission likely played a part in his conviction. Indeed, the jury's attention was specifically directed to defendant's statements in the course of the instructions. Nor does defendant's vague statement, that he was guilty on "some of the charges" in the complaint but not others, *20 eradicate the harm flowing from his specific admission of fondling, which the prosecutor emphasized in her summation as constituting strong corroboration of P.T.'s testimony.
On retrial, defendant's admission of "fondling" is deemed inadmissible and may not be used for any purpose.

II
Defendant attacks the admissibility of five segments of trial testimony relating what is claimed to be "fresh complaint" evidence on the part of P.T. or S.A.T. We agree that some of the testimony was inadmissible, but conclude that it either did not rise to the level of "plain error," R. 2:10-2, or was harmless error under the circumstances of the case. See State v. Macon, supra, 57 N.J. at 337-39, 273 A.2d 1. We will address each area in turn and then deal with the impact of any improperly admitted evidence on the trial. First, however, we briefly discuss the parameters governing the admission of such testimony.
The fresh complaint doctrine permits proof that a victim of sexual assault complained of the assault within a reasonable time to someone the victim would normally turn to for sympathy, protection and advice. State v. Hill, 121 N.J. 150, 163, 578 A.2d 370 (1990); State v. Tirone, 64 N.J. 222, 226, 314 A.2d 601 (1974); State v. Scherzer, 301 N.J.Super. 363, 419, 694 A.2d 196 (App.Div.) certif. denied, 151 N.J. 466, 700 A.2d 878 (1997); State v. J.S., 222 N.J.Super. 247, 252, 536 A.2d 769 (App.Div.), certif. denied, 111 N.J. 589, 546 A.2d 514 (1988). The evidence is permitted to forestall the assumption that no assault occurred because no complaint was made. State v. Balles, 47 N.J. 331, 338, 221 A.2d 1 (1966), cert. denied and appeal dismissed, 388 U.S. 461, 87 S.Ct. 2120, 18 L. Ed.2d 1321 (1967); Scherzer, supra, 301 N.J.Super. at 419, 694 A.2d 196; J.S., supra, 222 N.J.Super. at 252, 536 A.2d 769. Consistent with the rationale for its admissibility, which is to show only that a complaint was made, no details of the complaint are admissible. Hill, supra, 121 N.J. at 163, 578 A.2d 370. However, details of the complaint may be permitted to rehabilitate a witness after impeachment to show that statements were made after the incident consistent with the witness's trial testimony. Id. at 165, 578 A.2d 370; N.J.R.E. 607; see also, Buinno, Current N.J. Rules of Evid., comment 4 to N.J.R.E. 607 (2000).
While statements about the sexual assault must be reasonably contemporaneous, that requirement has been given a flexible application when the victim is a minor. State v. Bethune, 121 N.J. 137, 143, 578 A.2d 364 (1990). Thus, even a substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint. For example, in State v. Hummel, 132 N.J.Super. 412, 423, 334 A.2d 52 (App.Div.), certif. denied, 67 N.J. 102, 335 A.2d 54 (1975), a period of three years between assault and complaint was allowed where the fifteen-year-old victim had been repeatedly raped over a three-year period and had just been removed from her abuser, thereby freeing her from the bonds of a paralyzing fear. The remoteness of the complaint from the abuse was found to affect only the probative value, not the competency, of the evidence. Ibid.; see also State v. Balles, supra, 47 N.J. at 341, 221 A.2d 1. Flexible application of the doctrine to children's complaints is recognized as a necessity since children are especially vulnerable to being cajoled or coerced by their abusers into remaining silent; they may be too frightened or embarrassed *21 to reveal the abuse. State v. Bethune, supra, 121 N.J. at 143-44, 578 A.2d 364; State v. Kozarski, 143 N.J.Super. 12, 16, 362 A.2d 598 (App.Div.), certif. denied, 71 N.J. 532, 366 A.2d 687 (1976); Hummel, supra, 132 N.J.Super. at 423, 334 A.2d 52.
In addition to being reasonably contemporaneous, the complaint must be both spontaneous and voluntary, factors which may be negated if the complaint results from interrogation. See State v. Bethune, supra, 121 N.J. at 144, 578 A.2d 364; State v. Tirone, supra, 64 N.J. at 226-27, 314 A.2d 601; People v. Hood, 59 Ill.2d 315, 319 N.E.2d 802, 809 (1974) (complaint elicited by question from friends as to "what had happened" qualifies as excited utterance); People v. Damen, 28 Ill.2d 464, 193 N.E.2d 25, 30 (1963) (complaint elicited by question "what happened?" held admissible); People v. Evans, 173 Ill.App.3d 186, 122 Ill.Dec. 950, 527 N.E.2d 448, 458 (1988) (complaint made in response to questions such as "what's wrong?" and "Did he do something to you?" is admissible because the questions were non-coercive); State v. Stevens, 289 N.W.2d 592, 594-96 (Iowa 1980) (victim's complaint of having been raped, made in response to a friend's general inquiry about what was wrong, was admissible).
Frequently, juvenile sexual assault victims do not spontaneously tell of the assault without being prompted by questions. See State v. Bethune, 121 N.J. at 144, 578 A.2d 364. "Because the child has no clear understanding of what has been done to her, her `original complaint' often consists of responses to the questioning of a patient, persistent adult who draws the child's story from her." Ibid.; accord State v. D.R., 109 N.J. 348, 359-60, 537 A.2d 667 (1988); State v. Kozarski, supra, 143 N.J.Super. at 16-17, 362 A.2d 598. Thus, non-coercive questions do not rob a complaint of its admissibility under the "fresh complaint" rule. See State v. Hill, supra, 121 N.J. at 167, 578 A.2d 370; Bethune, supra, 121 N.J. at 144, 578 A.2d 364. To determine whether a statement is in response to non-coercive questioning, trial courts must consider the age of the child, the child's relationship with the interviewer, the circumstances under which the interrogation takes place, whether the child initiated the discussion, the type of questions asked, whether they were leading, and their specificity regarding the alleged abuser and the acts alleged. See State v. Bethune, supra, 121 N.J. at 145, 578 A.2d 364. See also State v. Michaels, 136 N.J. 299, 308, 642 A.2d 1372 (1994).
The first item challenged is P.T.'s statement to C.L. after C.L. found defendant's highly suggestive letter in her room. The incident took place on either March 19 or 20, 1998, just a day or two after P.T.'s mother had moved out of the house. At that point, C.L. had already become the paramour of P.T.'s father. As C.L. testified:
I was saying good night to [P.T.] down in her room. There was a piece of paper on the floor folded up and I picked it up and threw it on her dresser and I said next time pick your stuff off the floor and she said you can read it if you want to. I said no, it's not mine. She said but I want you to. I opened up the piece of paper and I read it.
Q: And what was the piece of paper?
A: It was a page written by [defendant] to P.T.
....
Q: With regard to the letter what did you do after you read it?
A: I closed my mouth, folded the piece of paper up and stuck it in my back pocket.
*22 Q: What happened next?
A: [P.T.] asked me if I was mad at her. She told me not to say anything to her father and I said we'll talk about it.
....
Q: And did she then go to sleep at night or at least did you put her to bed?
A: Yes.
Q: Did you say anything to her father that evening?
A: No.
Q: The next morning did you have a chance to speak with P.T.?
A: Yes.
....
Q: When you spoke with P.T. the next morning, ... did she tell you that [defendant] had touched her?
A: Yes.
Q: After speaking with her what did you do next?
A: I sent P.T. to her friend's house. S.A.T. and her boyfriend were at the house. I called S.A.T. up to the bedroom to ask her how to approach her father since she knew [him] better than I did.
Q: Who do you mean "approach her father?"
A: How to tell her father about this.
Q: And you say you called S.A.T. upstairs. Was there anyone else with you other than you and S.A.T.?
A: No.
Q: What happened at that point?
A: I started asking her what she thought of [defendant] and she told me....
....
Q: What did S.A.T. say?
A: She mentioned that [defendant] was touching her.
P.T.'s testimony about the incident was generally consistent. She stated that she told C.L. "what [the letter] was about and what had happened and what's been going on." She told C.L. "that [defendant] had raped me."
Although the exact dates are unclear, it appears that defendant's last act of sexual abuse on P.T. took place in close proximity to the date of the complaint, March 1998.[13] P.T. had previously spoken of defendant's conduct to her mother who had ignored her complaints, perhaps not unexpectedly since the mother had an ongoing sexual relationship with defendant. P.T. did not feel she could confide in her father since he had an explosive temper. C.L., on the other hand, had been living in the house with P.T. and had assumed a parental role. Significantly, it was almost immediately after P.T.'s mother left the house that she confided in C.L. upon discovery of the letter.
Under the circumstances, we conclude that P.T.'s statement to C.L. fell within the fresh complaint doctrine even though it resulted from an inadvertent discovery and some non-coercive questioning. The statement was reasonably contemporaneous and was both spontaneous and voluntary, considering P.T.'s age and the entire set of circumstances related above.
We reach a contrary conclusion, however, concerning S.A.T.'s statement to C.L., the second of the challenged fresh complaint statements. The act of sexual abuse involving S.A.T. allegedly took place six years earlier, sometime in 1992. At *23 the time the statement was made, S.A.T. was no longer living in the family residence and it does not appear that her relationship with C.L. was such as to promote a spontaneous confidential communication. Indeed, the statement was made in response to questioning about the letter from defendant to P.T. However, the statement made by S.A.T. was that defendant "was touching her," that she had experienced incidents similar to that of P.T. involving a "sexual assault, sexual abuse" by defendant. In light of the timing and circumstances of this revelation, indeed the very same considerations that make it inadmissible, as well as the jury's acquittal of defendant on the most serious charge involving S.A.T., we conclude that the error in admitting S.A.T.'s statement to C.L. in 1998 was harmless, not only as to the allegations involving S.A.T. herself, but as to P.T. as well.
The third category of statements were those made by P.T. to her school counselor and to Investigator Bandics. P.T. testified that she spoke with the school counselor the day after talking with C.L. and "told her some of the story." Less than a week later, Bandics and an unnamed DYFS investigator came to P.T.'s school and took a tape-recorded statement about the allegations. No details were provided. No objection was raised to this testimony, thus requiring a plain error analysis. R. 2:10-2.
Clearly, the investigatory interview with Bandics could not constitute fresh complaint evidence. However, we fail to see how any prejudice came about as a result of this testimony. Everyone, including jurors, are aware that interviews of alleged victims by police are routine.
The discussion with the school therapist is a closer question, but one we need not resolve. Here again, we find any error to be harmless given its totally innocuous nature.
The fourth area challenged as improper fresh complaint was testimony by S.A.T. as follows:
I met with Allan Bandics and I gave him my statement and then I also met with [P.T.]'s counselor `cause [P.T.] had brought out everything that happened to her and I told [the school counselor], which was [P.T.]'s counselor at the time, the incident with me so [P.T.] would feel comfortable giving her incidents to [the counselor].
....
Q: Did you have the occasion to speak with your sister, [P.T.], by yourself?
A: After [C.L.] told me about it, after we met with [the counselor] that evening, we came home, she goes, you know, I didn't tell [the counselor] everything. I said why not. She said I was afraid to. I said when do you plan on bringing the rest out? If you come down to my bedroom with me I'll tell you. That's what I did.
Q: And the two of you talked about the thing?
A: We talked about her incidents and then she says if you don't want to tell me you don't have to but did anything happen between you and [defendant] and I told her. I told her so it would make her feel more comfortable saying things.
Q: Did it appear to you that she did not know that something had happened to you?
A: She never knew. She said oh, I didn't know that.
Q: What was her demeanor when she was telling you about the things that happened to her? *24 A: She was very shy, very quiet about it. I think she was scared to bring it out. It took her a while to bring out everything. You know, she leaked out a little bit here, a little bit there, and finally I think once she met with Allan Bandics, the investigating prosecutor, she felt a little bit better. That's when everything came out.
Even though the discussion between S.A.T. and P.T. was preceded by P.T.'s revelation to C.L. and by S.A.T.'s conversation with C.L., we are inclined to view the testimony as permissible fresh complaint, particularly in the absence of any detail. In this instance, as well, the jury's verdict of acquittal on the two counts, one involving P.T. and one dealing with S.A.T., persuades us that any error would not meet the plain error standard, and would, in any event, constitute harmless error, assuming there is a difference between the two concepts. See State v. Macon, supra, 57 N.J. at 335 341, 273 A.2d 1. Here again, our conclusion applies to the charges concerning both P.T. and S.A.T.
The fifth and final segment of testimony challenged was that of Dr. Shaw who examined P.T., apparently at the request of DYFS. Dr. Shaw related P.T. "indicated to me that the kind of sexual abuse she was alleging included penile to genital area touching." Defendant also did not object to this testimony.
Dr. Shaw is the pediatric medical director of the Child Sexual Abuse program of the Dorothy B. Hirsch Child Protection Center, which serves seven counties in central New Jersey. She is also an associate professor of pediatrics at the University of Medicine and Dentistry of New Jersey and Robert Wood Johnson Medical School. In addition, Dr. Shaw is a consultant to the Division of Youth and Family Service and does "a lot of telephone consultation and case consultation with DYFS workers when they call for help." She testified in court as an expert "once every two months for the last ten years," the majority of times for the prosecution. Shaw examined P.T. in April 1998. As she explained:
[P.T.] was alleging that she had been sexually abused so that she was referred to us for our services. Our services generally include an assessment of whether the family is seeking counseling for themselves or their child, sort of crisis intervention, because most families are in crisis at the time this is being looked into and our purpose is to do medical visits to try to answer questions for kids or for the parents, try to address any concerns about pregnancy, sexually transmitted infections, damage to the body.
Shaw claimed that P.T. presented for "all three" reasons and, as a result, was seen "for treatment and diagnosis." The medical history, including the sexual abuse allegation, was taken in furtherance of that purpose. As she stated, "I asked some specific questions that I thought would help me to decide what I needed to do." P.T. told Shaw "that the kind of sexual abuse she was alleging included penile to genital area touching."
Shaw denied that the exam was undertaken for forensic purposes. The results of the examination revealed "nothing abnormal," no "suggestion either of a sexually transmitted infection, or any suggestion of something looking abnormal on the examination of the genital and the anal area." Nevertheless, the doctor testified as follows:
Q: Based on your experience and in your opinion is that finding a normal finding consistent with her history that she had given to you? *25 A: Oh, yes. The majority of girls that I see that have said there's been some touching of their genital area by a penis have no sexually transmitted disease nor do they have any abnormal findings of the tissues of that area.
Q: You say touching. Would that change if it was penile penetration?
A: Well, penile penetration just means that the penis is put between the outside genitals of the area so, no, that answer would not change by using the word penetration of the genital area or the girl's female area.
Q: So in a sense the majority of girls their findings are not abnormal in the examination?
A: That's correct.
Q: Would that change if I set up a hypothetical to you that sexual penetration or penile penetration occurred over many years approximately ten to fifteen times each year?
A: No. I often hear that and have examined many girls that have said they've had ongoing penetration. They're not usually using that word but the word meaning that the penis has been placed in that vaginal area many times, and that doesn't necessarily change my opinion as to that looking normal.
Q: How about with regard, and you mentioned this, to the last incident. Is that also a factor with regard to a finding of any abnormal finding so to speak?
A: As I mentioned if there had been acute sexual assaults, meaning acute sort of within the last couple of days, there might be some if someone had ejaculated, there might be a chance of finding something on the child's body. Perhaps if someone had rubbed that area vigorously and it were red that might last several days. If there had been something that had been sort of irritated and left it red or sort of like a minor abrasion of that area that might be present, so those are more likely to be seen closed in time to an act.
Q: Okay. So if there was a period of a number of months you may not be able to find indications such as that.
A: Correct.
Q: How about with regard to the age of the victim, does that change the hypothetical? If these incidents happened over a period when the child was 8 and up until 13 or 14 years of age, and a number of months after the last incident the child sees you, would that change in the age of the child having to do with findings?
A: Well, children as they go through puberty, that is, as girls, for example, begin their menstrual period, prior to menstruating they have some changes of the tissue of the genital area called the hymenal tissue that shows the effect of estrogen and it changes pretty drastically so that many of us in this medical field believe that if there had been some very minor glitch or abnormality of the hymen that was there before they went through puberty it might be difficult to see after the hormonal changes of puberty.
Q: Am I correct, and I'll let you answer this, it's normal for her examination to have been normal?
A: That's correct.
There was no objection to any of this testimony.
Defendant is correct that admission of Dr. Shaw's testimony cannot be sustained as fresh complaint evidence. Indeed, the *26 State appears to agree, arguing that it was nevertheless admissible under N.J.R.E. 803(c)(4), which provides:
Statements for purposes of medical diagnosis or treatment. Statements made in good faith for purposes of medical diagnosis or treatment which describe medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof to the extent that the statements are reasonably pertinent to diagnosis or treatment.
There is no doubt that if the examination by Dr. Shaw was conducted for evidence gathering purposes, the hearsay statements contained in the medical history would be inadmissible as not falling within this rule. State in Interest of C.A., 201 N.J.Super. 28, 33-34, 492 A.2d 683 (App.Div.1985). The record is not entirely clear as to why P.T. was referred to Dr. Shaw for examination. On the present record, and in recognition of it being the State's burden to establish admissibility, we conclude that the doctor's testimony was not admissible under N.J.R.E. 803(c)(4).
We also cannot conclude that the inadmissible testimony was harmless error, particularly when its impact is assessed together with defendant's erroneously admitted statement. The history taken and related by the doctor included P.T.'s statement that she had been subjected to "penile to genital area touching." While the court instructed the jury that fresh complaint evidence does not constitute proof "that the sexual offense actually occurred or that [P.T.] or [S.A.T.] is credible or not credible," the instruction went on in some detail to explain the proper purpose for which fresh complaint evidence is admitted. The problem is that, as we have concluded, Dr.Shaw's testimony was not fresh complaint evidence. Indeed, there is no indication that the jury understood Dr. Shaw's testimony as being part of the fresh complaint evidence. Rather, the jury may have accepted her recitation of P.T.'s history as being part and parcel of her expert opinion which the jury was instructed to evaluate on its own terms.
In her summation, the prosecutor again stressed P.T.'s statement to Dr. Shaw (mischaracterized as being that defendant "put his penis inside of her"), as constituting additional corroboration of P.T.'s testimony, just as she had done with respect to defendant's fondling admission. In any event, we need not determine whether this evidence standing alone would warrant reversal since, as noted, we have determined that a new trial is required because of the improper admission of defendant's statement.
We do not rule that Dr. Shaw's testimony in its entirety was inadmissible, only that part relating to the specifics of the sexual abuse as alleged by P.T. Dr. Shaw's expert testimony as to whether her negative physical examination of P.T. was consistent with the abuse testified to by P.T. was and remains acceptable. Of course, as with any expert, the jury must be instructed that to the extent the expert's testimony depends upon other testimony or upon a hypothetical state of facts supported by the evidence, it is for the jury to decide if the predicate facts are true; if the underlying facts are not believed, then the expert's opinion based on those facts carries diminished weight. In fact, the trial judge gave such a standard expert witness charge in this case.
As a result of our disposition, there is no need to address defendant's arguments as to ineffectiveness of trial counsel, or with respect to his sentence.
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Burris was decided before Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), which concluded that Miranda did announce "a constitutional rule." Id. at 444, 120 S.Ct. at 2336, 147 L.Ed.2d at 420. However, it is clear that the Court's acknowledgment of Miranda `s constitutional status did not overturn Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) or Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), which permit voluntary statements obtained in violation of Miranda to be used for impeachment purposes. Dickerson, supra, 530 U.S. at 441, 120 S.Ct. at 2334-2335, 147 L.Ed.2d at 418. See also Ashford v. State, 147 Md.App. 1, 807 A.2d 732, 758, cert. denied, 372 Md. 430, 813 A.2d 257 (2002); Stephen D. Clymer, Are Police Free to Disregard Miranda, 112 Yale L.J. 447, 529-30 (2002).
[3] In this case, defendant addressed the off-the-record statement in his direct examination, stating that he only said, "I might have touched the girls but I swear I never penetrated anybody with anything." He was not subject to any cross-examination on that statement.
[4] The judgment in Braeseke was vacated by the United States Supreme Court and the case was remanded to the Supreme Court of California to consider whether its judgment was based on federal or state constitutional grounds, or both. California v. Braeseke, 446 U.S. 932, 100 S.Ct. 2147, 64 L.Ed.2d 784 (1980). On remand, the California Supreme Court determined that the case was based upon Miranda and the Fifth Amendment to the United States Constitution. People v. Braeseke, 28 Cal.3d 86, 168 Cal.Rptr. 603, 618 P.2d 149 (Cal.1980), cert. denied, 451 U.S. 1021, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).
[5] Braeseke was decided by a narrow 4-3 vote. The dissenting justices emphasized the following facts: (1) the initial "off-the-record" statement was not itself directly incriminating but consisted of defendant asking the officer hypothetical questions; (2) prior to the tape recorded statement, which amounted to a full confession, the officer readministered Miranda warnings (although inadvertently omitting the right to remain silent); (3) a few hours later defendant gave a second tape recorded confession preceded by full Miranda warnings. At that time defendant also acknowledged that he had given his first confession with a full understanding of his rights. Clearly, the facts in the present case are far removed from those which led to the split decision in Braeseke.
[6] Watford was the subject of extensive discussion in George E. Dix, Promises, Confessions, and Wayne LaFave's Bright Line Rule Analysis, 1993 U. of Ill. L.Rev. 207 (1993) (hereinafter Dix).
[7] It has been pointed out that the concern with official promises as one of the factors that might render a confession inadmissible can be traced back to Lord Mansfield in the 18th century. Reynolds v. State, supra, 610 A.2d at 786. See also Dickerson, supra, 530 U.S. at 433, 120 S.Ct. at 2329, 147 L.Ed.2d at 412.
[8] Despite these developments, it appears that some jurisdictions may still adhere to the Bram formulation. See State v. Leonard, 605 So.2d 697, 699 (La.App.1992); Abram v. State, 606 So.2d 1015, 1031-33 (Miss.1992).
[9] We need not go so far as to adopt Professor Dix's conclusion, that "due process voluntariness or its state law equivalents should be read as embodying an across-the-board prophylactic promise rule requiring exclusion if a confession [was] given after officers or prosecutors made a promise of leniency to the suspect.... Fulminante's rejection of a promise rule as an aspect of due process voluntariness was unwise and should be revisited. State courts, construing state constitutional or statutory provisions, should reject the Fulminante #model as ill-considered and unsupportable upon further consideration." Dix, supra, 1993 U. of Ill. L.Rev. at 258.
[10] In a footnote, the Carswell court said: "We need not, and do not, consider whether a confession made in direct response to an untrue assertion that a suspect is speaking off-the-record is admissible." Id. at 346 n. 8. Of course, that is precisely the question we address here.
[11] As we have noted, defendant invoked his right to counsel before making his off-the-record inquiry. Defendant has not raised, and therefore we do not address, whether Bandic's agreement to hear defendant's statement constituted interrogation, as defined in Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980), thereby violating the bright line rule of State v. Hartley, supra, 103 N.J. at 278-79, 511 A.2d 80, that requires all questioning to cease, id. at 268-70, 511 A.2d 80, once an accused has invoked his right to silence, unless Miranda warnings are first re-administered. Even if there is doubt about whether a suspect intends to waive a previously asserted right to counsel, the police must clarify the suspect's intention before further conversation ensues. See State v. Chew, 150 N.J. 30, 63, 695 A.2d 1301 (1997), cert. denied, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999); State v. Johnson, 120 N.J. 263, 284, 576 A.2d 834 (1990); State v. Wright, 97 N.J. 113, 120, 477 A.2d 1265 (1984). A statement taken in violation of the Hartley rule cannot be used for any purpose. State v. Burris, supra, 145 N.J. at 520, 526-29, 679 A.2d 121; Hartley, supra, 103 N.J. at 261, 511 A.2d 80.
[12] In Fulminante a narrowly divided court (5S-4) held that admission of an involuntary confession was subject to harmless error analysis. In the absence of any contrary ruling from our Supreme Court, we adhere to the Fulminante ruling. It should be noted, however, that the Fulminante rule has been the subject of scholarly criticism. See, e.g., J.L. Renfro, Arizona v. Fulminante: Extending Harmless Error Analysis To The Erroneous Admission of Coerced Confessions, 66 Tul.L.Rev. 581, 590 (1991). (hereinafter Renfro). Indeed, it has been argued that harmless error analysis should not apply to any constitutional error because "[t]he doctrine is unmatched as a tool for the secret theft of constitutional rights." Stephen H. Goldberg, Harmless Error: Constitutional Sneak Thief, 71 J. Crim. L. & Criminology, 421, 436 (1980).
[13] P.T. was sixteen at the time of trial in March 2000. The last act of abuse occurred when she was fourteen.