# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2932-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

O. D. A.-C.,

     Defendant-Appellant.

_____

Submitted October 14, 2020 – Decided  February 8, 2021

Before Judges Fisher, Gilson and Moynihan (Judge Gilson dissenting).

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 14-12-1997.

John Vincent Saykanic, attorney for appellant (John Vincent Saykanic, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Edward F. Ray, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant O. D. A.-C.[1] appeals from a judgment of conviction filed after he pleaded guilty to second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count twelve), reserving his right to appeal from the trial court's denial of his motion to suppress a statement he gave to a Bergen County Prosecutor's Office (BCPO) detective and a Hackensack detective after he was transported to a police station directly from a medical center from which he was discharged. On appeal, he argues:

> POINT I
>
> DEFENDANT'S STATEMENT MUST BE SUPPRESSED AS THE FRUIT OF AN ILLEGAL ARREST BECAUSE HIS <u>MIRANDA</u>[2] AND CONSTITUTIONAL RIGHTS WERE VIOLATED AS HE WAS INVOLUNTARILY TAKEN INTO INVESTIGATORY DETENTION FROM THE BERGEN REGIONAL MEDICAL CENTER (THE CONSTITUTIONAL EQUIVALENT OF AN ARREST).
>
> POINT II
>
> THE COURT BELOW ERRED IN FINDING THAT DEFENDANT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVED HIS <u>MIRANDA</u> RIGHTS; DEFENDANT COULD NOT HAVE MADE A KNOWING, INTELLIGENT[] AND VOLUNTARY

---

[1]  We use defendant's initials to protect the privacy and identity of the victim. <u>R.</u> 1:38-3(c)(12).

[2]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-2932-18

WAIVER OF HIS <u>MIRANDA</u> RIGHTS BASED ON THE DETECTIVE'S MISLEADING PRESENTATION OF THOSE RIGHTS.

We determine defendant's argument that he was illegally arrested to be without sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(2). Defendant was not arrested until after the statement was completed, and, in any case, the victim's statement to police describing the numerous times defendant assaulted her[3] established probable cause to arrest him. <u>See</u> <u>State v. Basil</u>, 202 N.J. 570, 585-87 (2010).

Although we must uphold a trial court's factual findings when "supported by sufficient credible evidence in the record," <u>State v. Scriven</u>, 226 N.J. 20, 40 (2016); <u>see also</u> <u>State v. Boone</u>, 232 N.J. 417, 425-26 (2017), especially when those findings "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot

---

[3] The victim's statement was not included in the appellate record. While taking defendant's statement, the BCPO detective told him the victim's allegations:

> You know, she described the bed to us that she's been—
> in the bed, you would come into the room, you know,
> climb into the bed with her, you used to touch her breast
> area, underneath her clothing[,] and you used to put
> your hand underneath her clothing and touch her
> vagina, all right. You also used your mouth and kissed
> her neck, told her you loved her. You kissed her vagina,
> you kissed her mouth, uh, kissed her breast area.

enjoy," State v. Johnson, 42 N.J. 146, 161 (1964); see also State v. Gamble, 218 N.J. 412, 424-25 (2014), we owe no deference to conclusions of law made by trial courts in suppression decisions which we review de novo, State v. Watts, 223 N.J. 503, 516 (2015).  Because the Hackensack detective's statements during questioning vitiated defendant's Miranda rights, we are compelled to reverse the trial court's denial of defendant's suppression motion.

In its written decision, rejecting defendant's argument to the contrary, the trial court agreed with the State's assertion that defendant was not in custody when he was questioned by the detectives, finding credible the BCPO detective and a Hackensack police officer who both testified at the suppression-motion hearing that defendant was not handcuffed when he agreed to go with the police. The trial court also credited the police officer's testimony that "he believed that . . . defendant would have been free to go when he wanted."

The police officer's belief, however, should not have been considered in determining whether defendant was in custody.  Instead,

> [t]he test of whether an individual is in custody for Miranda purposes is an objective test, which focuses on the totality of the circumstances.  The circumstances include the time and place of the interrogation, the length of the interrogation, the conduct of the interrogators and the status of the suspect.  "[C]ustody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would

4

> reasonably lead a detainee to believe he could not leave freely."

> [State v. Messino, 378 N.J. Super. 559, 576 (App. Div. 2005) (citations omitted).]

The defendant in Messino, like defendant, voluntarily agreed to accompany police to be interviewed and was not placed under arrest. Ibid. We concluded a reasonable person in that defendant's stead would not have felt he could depart because he was not told he was free to go and there was no practical way for him to leave the distant prosecutor's office. Id. at 576-77. The circumstances here more compellingly meet the objective standard for custody.

Even if defendant agreed to go with the officers to the police station and was not handcuffed or arrested, the circumstances, as testified to by the State's witnesses, evidence defendant's custodial status. After the Hackensack detective learned defendant was to be medically discharged, a Hackensack police sergeant and the officer who testified went to the medical center. The officer stood by defendant while he completed his discharge documents to "keep an eye" on him for ten to fifteen minutes until the BCPO detective arrived. The officer moved defendant out of the discharge room to the lobby area where the BCPO detective spoke to defendant. After the Hackensack sergeant and the BCPO detective discussed "where the statement [from defendant] was going to

5

[take] place," the testifying officer transported defendant to the police station; the officer drove while the Hackensack sergeant sat in the rear of the police vehicle with defendant during the ten-to-fifteen-minute drive. At the police station, defendant was brought to and "placed in" an interview room by the police.

During the near thirty-five-minute statement, it was clear defendant was a suspect in the sexual crimes committed against his girlfriend's granddaughter. The BCPO and Hackensack detectives recounted both the statement they took from the victim during which she described the numerous times defendant touched her when she was eleven or twelve years old and the interviews of other people who provided consistent statements. The detectives told defendant "there's nothing that's telling us that this girl is lying"; "there's nothing that she's saying that we feel doubtful about"; "[t]his girl is not confused about what happened"; "we did our investigation and we feel comfortable that . . . what she's telling us is true"; "[w]e don't doubt that [the assaults] happened . . . [w]e believe what she has to say . . . [n]ow, we're here today to hear . . . your version of events." The detectives told defendant: "[T]here is a case against you, that's why you're here, that's why we were looking for you last week . . . when we went to your house and found out that you had gone to [the medical center.]"

A-2932-18

They continued: "This is not something that's going away, all right?" And, later: "We did the investigation up to the point where we've reached the end, where we had to confront you . . . and see what you had to say."

Though defendant was told he was not under arrest, he was never told he was free to leave. The detectives did not question defendant to obtain information. They questioned him to obtain confirmation. The detectives compiled an abundance of evidence from the victim and other witnesses, which they made plain to defendant. That information, especially in light of the credence the detectives gave to that evidence, together with the police conduct at the medical center, en route to the interview room at the police station and in the interview room, would not leave a reasonable person to think he or she was leaving the police station when questioning ended. See State v. Pearson, 318 N.J. Super. 123, 134-35 (App. Div. 1999).

Although we disagree with the trial court's determination that defendant was not in custody, we agree with its conclusion that the detectives initially complied with the mandate that Miranda warnings[4] be administered to subjects

---

[4] A person subject to custodial interrogation must be told:

> [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of

of "custodial interrogation," see Miranda, 384 U.S. at 444-45, "[t]o counteract the inherent psychological pressures in a police-dominated atmosphere that might compel a person 'to speak where he would not otherwise do so freely,'" see State v. Nyhammer, 197 N.J. 383, 400 (2009) (quoting Miranda, 384 U.S. at 467). Those warnings are "prophylactic measures that are necessary to safeguard the essential constitutional right against self-incrimination." State v. Burris, 145 N.J. 509, 518 (1996).

The trial court found defendant said he understood each right read to him, as well as the waiver read to and read by defendant, and that he signed the document waiving his rights. We also note the trial court's observation that this was not defendant's "first experience with law enforcement," defendant having acknowledged during his statement giving a statement to law enforcement on a prior occasion. And the trial court recognized defendant's invocation of his right to counsel that ended the interview, concluding "defendant's rights were not violated and [his] statement was made with a valid waiver of those rights."

---

law, [3] that he has the right to the presence of an attorney[] and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

[Miranda, 384 U.S. at 479.]

The administration of <u>Miranda</u> warnings does not obviate the need for our analysis of the statement's voluntariness, a legal issue requiring our independent review. <u>State v. Pillar</u>, 359 N.J. Super. 249, 268-69 (App. Div. 2003). Defendant argues the Hackensack detective's comments at key intervals during defendant's statement directly contradicted the warnings he administered, neutralizing their purpose and rendering the statement involuntary.

Just before defendant was Mirandized, the BCPO detective told defendant the Hackensack detective was "gonna go through some information and some questions [the detectives] ha[d] to ask [him] first before [they] can talk to [him]." The Hackensack detective began the administration of rights by telling defendant: "Just a formality. [O. D. A.-C.], I just have to read you your rights, okay? Just tell me if you understand them, if you don't, I'll explain them to you."

Approximately twenty-three minutes into the interview—after the detectives had detailed the victim's allegations and expressed their belief in their veracity, during which defendant was largely reticent—the BCPO detective and defendant had this exchange:

> [BCPO Detective:] That's how she knows when it ended. She said it never happened after Hurricane Sandy. It happened—so she knows she was [thirteen] when it ended. The last time was before that storm. That she remembers but she can't remember when it started but it happened somewhere between [eleven]

9

and [twelve] and ended October of last year, somewhere before, before that storm and she says it's [eight] to [fifteen] times, okay. That's the number she gives us, you know. Is that too many? Or is it—

[Defendant:] It's too many.

[BCPO Detective:] Is it [fifteen] times that this happened?

[Defendant:] [Fifteen] times?

[BCPO Detective:] [Twenty] times?

[Defendant:] I don't—I don't think so.

[BCPO Detective:] You don't think so?

[Defendant:] I don't think so.

[Hackensack Detective:] A couple times?

[BCPO Detective:] It happened once or twice, is it more likely that's what happened? Is that number too big? [O. D. A.-C.], be truthful with me, I know—I could see it in your face, you wanna get it out in front of us—

[Hackensack Detective:] And you're gonna feel so much better about yourself once you do get it out.

[Defendant:] If you turn that off and then I—

The BCPO detective immediately interrupted defendant and told him, "I can't turn that off, okay. . . . And this room is being recorded also. . . . That's a law, that's to protect you." But the Hackensack detective interjected:

What we talk about in here is between us, that's why I b[r]ought you in this room, I didn't wanna speak about it in front of the secretary and in front of the other people in there. We have civilians walking into that room, that wouldn't be fair to you or us having people coming in there listening to what we're talking about. We're in here, it's confidential between us, it's staying between us, okay.

Defendant then told the detectives about his steroid use and agreed with the Hackensack detective that it caused him to do "silly things." The detectives continued questioning about the number of assaults:

[BCPO Detective:] Well, how many times do you think this happened? Really? Is it more than [fifteen]?

[Defendant:] I don't know what to tell you guys. I mean, you put it—it's like—

[Hackensack Detective:] You gotta just tell the truth. We don't wanna put words in your mouth.

[BCPO Detective:] Well, I'm not saying—listen, I'm not saying—it's not a hundred, right? This didn't happen a hundred times? You didn't touch this girl a hundred times? Right?

[Hackensack Detective:] And she's not even saying that.

[Defendant:] Hundred times. Not [fifteen].

[BCPO Detective:] Okay, not [fifteen].

[Defendant:] Not ten.

11

[BCPO Detective:] So is it—not ten?  So you think it was less than [ten]?  You know, kids don't know numbers that well, you know, this is a hard thing for her, she's only a little girl and, and you know to have this thing happen to her and then for me to ask her how many times, she doesn't know.  So she was taking a guess at [fifteen]—between [eight] and [fifteen].  That's the number she gave me, but I want to hear it from you.  Is it something that happened more than once?

[Defendant:] I don't know what to tell you.

[BCPO Detective:] Well, that's not a hard question.  We're already at the point it happened, right?  We're just at the point of how many times.

[Defendant:] Well, first of all, when you make me write that, it say[s] that anything that I say, it goes against my, you know.

[BCPO Detective:] That's your—

[Hackensack Detective:] That's a formality, that's what it is.

[Defendant:] [I]t's gonna work against me.  So if I tell you yes, I did it or no I didn't, it's not, so, you know.

In determining the voluntariness of defendant's statement, we analyze, as part of the totality of the circumstances, see State v. Warmbrun, 277 N.J. Super. 51, 62 (App. Div. 1994), the detective's repeated misrepresentations that Miranda warnings were "a formality" and that defendant's conversation with the detectives was "confidential between" them, recognizing "misrepresentations

12

A-2932-18

alone are usually insufficient to justify a determination of involuntariness or lack of knowledge," see State v. Cooper, 151 N.J. 326, 355 (1997); see also Pillar, 359 N.J. Super. at 269. "Moreover, a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." Cooper, 151 N.J. at 355.

In isolation, the detective's first comment that the Miranda warnings were just "a formality" could be overlooked as an offhand remark that simply preceded the warnings defendant said he understood and waived. But all the detective's statements have to be viewed in context.

The detective told defendant that their discussion was "between" them and was "confidential" and "staying between us" only after defendant asked for the recording to be turned off. Moreover, that comment followed and countered the BCPO detective's explicit denial of defendant's request to "turn that off." And it prompted defendant to make further disclosures about how his steroid use caused him to do "silly things" and the number of assaults.

Furthermore, when defendant did not give the detectives a definite number and harkened to the Miranda warning that anything he said would be used against him, the Hackensack detective undercut that right by repeating his prior statement that the warnings were "a formality."

Immediately following that misrepresentation, the BCPO detective reiterated that defendant was not under arrest and that he "sat [defendant] down [and] told [him] what [his] rights [were]," including that defendant had "the right to not tell [the detectives] anything [he] want[ed]." The BCPO detective also told defendant anything he told the detectives might "help [the BCPO detective] when [he] talk[ed] to [his] bosses, or a judge, or a jury or whoever else gets involved in this after this point." The BCPO detective continued:

> I need to be able to feel right for myself that I didn't misjudge you and think then maybe you are a bad guy, you know, maybe I misjudged that cause I don't think you are and I think you're just a little afraid to tell me what happened right now, but you've already pretty much admitted to me that this did happen by saying, "well, it didn't happen that many times." You said, "well not [fifteen]."

When the Hackensack detective added, "[a] couple times," defendant responded, "maybe five." After one of the detectives repeated, "[m]aybe five times," "[m]aybe not five," defendant responded, "[m]aybe a couple times, maybe not."

The BCPO detective's reiteration of defendant's right to remain silent did nothing to dispel the Hackensack detective's abrogation of the warning that anything defendant said could be used against him. That detective was not merely telling defendant he did not want their conversation overheard by others in the police station, as evidenced by his statement near the end of the interview

14

when he told defendant, "[a]nything you say, like I said, is only going to help you, it's not going to hurt you. You understand what I'm saying?"

As we held in Pillar, "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." 359 N.J. Super. at 268. The Hackensack detective's assurance of confidentiality undermined the Miranda warning that anything defendant said could be used against him "at least with respect to a statement made . . . in immediate and direct response to the misleading assurance." See ibid. It also rendered the balance of the statement involuntary. See id. at 269.

To be sure, defendant had prior encounters with police interrogation, confirmed he understood the Miranda warnings, knew his statement was recorded and eventually invoked his right to counsel ending the interview. But the Hackensack detective's statements undermined the warnings from the start and continued to misrepresent their effect. His numerous misrepresentations drew admissions as to the number of assaults from an otherwise-reticent defendant. The timing of those misrepresentations calls into question defendant's true understanding of his rights. See State v. Puryear, 441 N.J. Super. 280, 297 (App. Div. 2015) ("The focus of a Miranda analysis should be on whether the defendant had a clear understanding and comprehension of his

or her <u>Miranda</u> rights based on the totality of the circumstances."). Thus, the State failed to carry its burden "to prove beyond a reasonable doubt that a defendant's waiver is knowing, voluntary[] and intelligent." <u>See</u> <u>ibid.</u>

Our conclusion that the trial court's legal analysis was not entirely correct leads us to reverse its denial of defendant's motion to suppress. <u>See</u> <u>State v. K.W.</u>, 214 N.J. 499, 507 (2013). Because the Hackensack detective built upon the initial misrepresentation that the <u>Miranda</u> warnings were just a formality, the entire statement must be suppressed. We also vacate defendant's conditional plea.

Like our dissenting colleague, we well realize the victim may have to recount defendant's alleged attacks. That is the deplorable result of the Hackensack detective's conduct during defendant's statement. We cannot countenance the detective's blatant end-run around measures designed to protect bedrock constitutional guarantees.

So too, we recognize the impact of the passage of time since the alleged assaults. But, if the passage of time from the alleged crime to the recognition of a breach of a defendant's constitutional rights is relevant, there is no evidence to suggest defendant did anything to delay the progress of this prosecution except timely assert his rights. The record reveals that defendant moved to

A-2932-18

suppress his statement to the police in March 2016. An initial <u>Miranda</u> hearing did not occur until almost seventeen months later, and testimony was not continued until December 2017. The issue was not decided until March 2018, two years after defendant moved to suppress. Defendant pleaded guilty six months later, was sentenced a few months after that, and then timely filed this appeal. We appreciate the unfortunate impact suppression of defendant's statement may have on the victim, but we do not agree that the pace at which this matter progressed – through no fault of defendant – and the consequential passage of time, should somehow result in the forfeiture of defendant's constitutional rights.[5]

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We also note that the State has not argued that the denial of defendant's suppression motion may be affirmed because of the impact on the victim, nor are we aware of any authority that would justify such a conclusion.

A-2932-18

_____

**GILSON, J.A.D., dissenting.**

Following an evidentiary hearing, the trial court found that defendant had been given his <u>Miranda</u> rights, had knowingly, voluntarily, and intelligently waived those rights, and had agreed to speak with two detectives. Thus, the trial court denied defendant's motion to suppress his statement. My colleagues reject the trial court's findings and hold that defendant's <u>Miranda</u> rights were vitiated based on two statements made by one of the detectives: (1) the warnings were a "formality"; and (2) the interview was confidential. Viewed in context, neither of those improper statements undermined the clear and correct <u>Miranda</u> warnings given to defendant. I therefore respectfully disagree with my colleagues, defer to the factual findings made by the trial court, and dissent.

Certain facts are not in dispute. In September 2013, the granddaughter of defendant's girlfriend told police that defendant had repeatedly sexually assaulted her over a two-year period when she was between the ages of eleven and thirteen. At that time, defendant was in his forties. Shortly after those allegations were made, defendant checked himself into a hospital. Thereafter, law enforcement personnel learned that defendant was being discharged, met him at the hospital, and requested defendant to come to a police station to give a statement. Defendant was then taken to the police station where he was

interviewed for approximately thirty-five minutes by two detectives: a detective from the Bergen County Prosecutor's Office (BCPO) and a detective from the Hackensack Police Department.

At the beginning of the interview, the detectives told the defendant that they were going to "go through some information and some questions[.]" The Hackensack detective then stated: "Just a formality. [O. D. A.-C], I just have to read you your rights, okay? Just tell me if you understand them, if you don't, I'll explain them to you." The Hackensack detective then read defendant each of his <u>Miranda</u> rights from a form. Defendant acknowledged he understood each right. He then initialed the form next to each of his rights and signed a statement agreeing to waive those rights and to speak with the detectives.

The detectives next confirmed that defendant understood what was happening, that he was thinking clearly, and that he was not under the influence of any alcohol or drugs that interfered with his ability to understand the interview process. Thereafter, the BCPO detective told defendant about the allegations made by the girl. Defendant did not deny those allegations; rather, he responded with non-definitive replies such as "um-hmm," "okay," and "I understand."

A-2932-18

The detectives then told defendant that the girl claimed he had touched and rubbed her chest and vagina eight to fifteen times, and they asked: "Is that too many? Or is it - -" Defendant responded: "It's too many." The following exchange then took place:

[The BCPO Detective] Is it 15 times that this happened?

[Defendant] 15 times?

[The BCPO Detective] 20 times?

[Defendant] I don't - - I don't think so.

[The BCPO Detective] You don't think so?

[Defendant] I don't think so.

[The Hackensack Detective] A couple times?

[The BCPO Detective] It happened once or twice, is it more likely that's what happened? Is that number too big? [O. D. A.-C], be truthful with me, I know - - I could see it in your face, you wanna get it out in front of us - -

[The Hackensack Detective] And you're gonna feel so much better about yourself once you do get it out.

[Defendant] If you turn that off and then I - -

[The BCPO Detective] I can't turn that off, okay.

[Defendant] And this - -

3 A-2932-18

[The BCPO Detective] And this room is being recorded also. I can't - -

[Defendant] I know but that's I got - - IA - -

[The BCPO Detective] That's a law, that's to protect you.

[The Hackensack Detective] What we talk about in here is between us, that's why I bought you in this room, I didn't wanna speak about it in front of the secretary and in front of the other people in there. We have civilians walking into that room, that wouldn't be fair to you or us having people coming in there listening to what we're talking about. We're in here, it's confidential between us, it's staying between us, okay.

[The BCPO Detective] It has - -

[The Hackensack Detective] You're at the point where you want to tell us what happened and that's fine, okay.

[Defendant] What I was gonna tell you, you know, it was, uh, I was - - I was, was injecting myself.

[The Hackensack Detective] You was what?

[Defendant] Injecting, you know.

[The BCPO Detective] You were injecting yourself?

[Defendant] You know, with - -

[The BCPO Detective] Like, steroids?

[Defendant] Steroids.

[The BCPO Detective] Okay.

4

[The Hackensack Detective] Okay.

[The BCPO Detective] Is that why this happened?

[Defendant] No, maybe happen, you know, when you inject yourself, I mean - -

[The Hackensack Detective] You do silly things.

[Defendant] You do silly things.

The BCPO detective then asked how many times it happened, and defendant replied: "I don't know what to tell you guys." The following exchange then took place:

[The BCPO Detective] Well, that's not a hard question. We're already at the point it happened, right? We're just at the point of how many times.

[Defendant] Well, first of all, when you make me write that, it say that anything that I say, it goes against my, you know.

[The BCPO Detective] That's your - -

[The Hackensack Detective] That's a formality, that's what it is.

[Defendant] - - IA - - it's gonna work against me. So if I tell you yes, I did it or no I didn't, it's not, so, you know.

[The BCPO Detective] [O. D. A.-C], like I said to you before, this is your opportunity to tell us in your words, I told you - - I'm being a hundred percent truthful with

5

you, if you feel in any way that I've lied to you in any way about anything in bringing you here, I've been truthful with you at the hospital - -

The BCPO detective then reminded defendant of his rights, including his right not to tell the detectives anything. The BCPO detective then referenced defendant's use of steroids and asked: "Do you think the steroids is what made you do these things?" Defendant responded: "I don't know. I mean, I - - that's the only thing I can tell you. I was using ster - - steroids at the time, I really - - I don't know. If you say that she says that maybe I wake in the middle of the night or something like that, you know." Shortly thereafter, defendant asked to have a lawyer present and the detectives ended the interview.

The trial court had the opportunity to hear testimony from the BCPO detective and defendant and credited the testimony of the detective. The trial court then found that defendant had been given his full Miranda rights and had knowingly, voluntarily, and intelligently waived those rights. In making that finding, the court rejected defendant's argument that he was confused by the reference to the warnings as a mere formality. The trial court also rejected defendant's argument that he believed the interview was confidential. The trial court noted that defendant acknowledged that this was not the first time he had

6

been questioned by police and that throughout the interview defendant exhibited a clear understanding of what was going on and his rights.

Given that the trial court made those findings after hearing defendant's testimony and reviewing the audio and video recording of the interview, I discern no basis for rejecting those findings. See State v. S.S., 229 N.J. 360, 380-81 (2017) (holding that a trial court's factual finding based on review of a video recording are entitled to deference). Accordingly, reversal is warranted only if the trial court's determination is "so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). This is not such a case.

My colleagues are correct that the Hackensack detective improperly referred to the Miranda warnings as a formality and improperly told the defendant that the interview was confidential. Both those statements, however, were made in a context that did not vitiate the proper Miranda warnings. Right after the "formality" reference was made, defendant was read his rights and shown a Miranda card with each of his rights. He acknowledged both orally and in writing that he understood each of the rights, signed a waiver of those rights, and agreed to speak with the detectives. See, e.g., State v. Nyhammer, 197 N.J.

383, 400-01, <u>cert. denied</u>, 558 <u>U.S.</u> 831 (2009); <u>State v. Knight</u>, 183 <u>N.J.</u> 449, 462-63 (2005); <u>State v. Bey</u>, 112 N.J. 123, 135 (1988) (citing <u>Schneckloth v. Bustamonte</u>, 412 <u>U.S.</u> 218, 226 (1973)).

Moreover, a review of the recorded interview demonstrates that the trial court's finding that defendant understood his rights throughout the interview is supported by defendant's conduct.  <u>See</u> <u>State v. A.M.</u>, 237 N.J. 384, 399-400 (2019) (finding suspect's calm, alert appearance, ability to appreciate and answer questions posed, and opportunity to read <u>Miranda</u> waiver provision worked against implication he was confused or did not appreciate his rights).  <u>See also</u>, <u>State v. W.B.</u>, 205 <u>N.J.</u> 588, 603 n.4 (2011) ("As the finding of compliance with <u>Miranda</u> and voluntariness turned on factual and credibility determinations, we need only find sufficient credible evidence in the record to sustain the trial judge's findings and conclusions." (citing <u>Elders</u>, 192 <u>N.J.</u> at 242-44)).

Even when told that the interview was confidential, defendant recognized that the interview was being recorded.  When he asked to have the recording turned off the BCPO detective told him that the recording could not be turned off and reminded him that he did not have to speak with the detectives.  Furthermore, defendant's statements during the interview, including his comment that confessing would "work against [him]" belie the contention that

8

his understanding of his rights was undone by the Hackensack detective. Indeed, toward the end of the interview, after the detective unwisely stated anything defendant said would only "help [him]," not "hurt [him]," defendant immediately expressed his discomfort and, as the trial court found, elected to end the interview by invoking his right to have counsel. Again, those findings are amply supported by the record. See A.M., 237 N.J. at 399 (citing S.S., 229 N.J. at 365) (affirming denial of motion to suppress because "sufficient credible evidence in the record support[ed] the trial court's findings").

In short, while the two misstatements by the Hackensack detective were improper, they did not undermine the clear Miranda warnings that had been given to defendant or his knowing, intelligent, and voluntary waiver of those warnings.

We also need to recognize and consider the ramifications of a reversal. Several months after the denial of his motion to suppress his statement, defendant, with the advice of counsel, pled guilty to second-degree endangering the welfare of a child. During that plea, he admitted that he had engaged in sexual conduct by touching the granddaughter of his girlfriend in her "private areas" with his hands. That conduct took place in 2010 to 2012, when the girl was between the ages of eleven and thirteen. A reversal now in 2020 would

9

vacate defendant's guilty plea and would require the girl to have to relive her abuse by potentially testifying at a trial.

Certainly, if there had been a clear violation of defendant's <u>Miranda</u> rights, reversal would be a necessary ramification. But for the reasons I have already detailed, I do not see a violation of defendant's <u>Miranda</u> rights. Moreover, I do not see a clear violation in light of the factual findings made by the trial judge, who had the benefit of hearing live testimony from the BCPO detective, and defendant, as well as reviewing the recorded interview. For all those reasons, I would affirm the trial court's decision to deny defendant's motion to suppress his statement and, therefore, I dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2932-18