**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1013-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL T. WEATHERSBEE,
a/k/a MICHAEL T.
WEATHERBEE,

     Defendant-Appellant.

_____

Argued October 21, 2024 – Decided March 6, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-12-1104.

Austin J. Howard, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Austin J. Howard, of counsel and on the briefs).

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for the respondent (Esther Suarez, Hudson County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the brief).

PER CURIAM

Defendant Michael Weathersbee appeals convictions for murder and related weapons offenses. Defendant contends he was denied a fair trial because the trial court improperly admitted into evidence a recording of a police interrogation of defendant in violation of his right against self-incrimination and due-process rights. In addition to challenging the admission of the statement in its entirety, defendant faults the court for failing to require redaction of certain portions of the statement. Those portions included detectives opining about defendant's guilt, credibility, motive, opportunity, and premeditation. Defendant further contends the trial court improperly allowed the State to comment on the invocation of his right to silence and precluded him from cross-examining a witness about identification testimony. Because the court erred in admitting the recording of defendant's statement and in detailing the predicate offenses on which a certain-person charge was based, and due to the cumulative errors by the court, we vacate the judgment of conviction and remand for proceedings consistent with this opinion.

I.

Just after 2:00 a.m. on September 23, 2018, the Jersey City Police Department received a report of a shooting in the vicinity of New Street.

A-1013-22

Arriving on the scene, police observed a man seated in the driver's seat of a car. It was apparent he had suffered gunshot wounds to the head and torso. The man, later identified as Laquan Clark, was brought to the Jersey City Medical Center and pronounced deceased.

Earlier that evening, Clark had been at "Brenda's Place," a bar close to where he was later found shot. As part of their investigation, police gathered video footage from businesses, residences, and CCTV cameras in the surrounding area. That footage shows Clark arriving at the bar at approximately 12:10 a.m., and later walking in and out of the bar several times. After the bar closed at 2:00 a.m., Clark walked a short distance to his car parked on New Street. The shooting was not captured on video, but the reaction of other patrons who had congregated just outside the bar as the shooting took place is visible. The video shows the presumed perpetrator soon after the shooting running down New Street, away from Clark's car.

Police investigation linked the video footage of the man running from the scene to a Jeep Cherokee seen circling the area, then speeding away. Further investigation found the Jeep was registered to Michael Weathersbee, Sr., defendant's father. Defendant's father informed detectives defendant had exclusive use of the vehicle during the time in question.

A-1013-22

The Interrogation

Based on this information, several members of the Hudson County Prosecutor's Office (HCPO) traveled to defendant's workplace and transported him in a police car to the HCPO Homicide Unit. Once there, detectives took possession of defendant's cell phone and escorted him to a 10 x 10-foot interview room. Defendant was seated with his back against a wall, while Detectives Lamar Nelson and Kenneth Green sat between defendant and the room's only door. Defendant remained in the room for over seven hours. Within that period, the detectives questioned defendant for approximately two and a half hours.

After collecting biographical information and before administering Miranda rights, detectives told defendant, "[j]ust like . . . anybody else that come[s] down here, we gotta read you your rights and things like that." Miranda v. Arizona, 384 U.S. 436, 444 (1966). When asked if he wished to answer questions, defendant responded, "Mm, cool." Detectives handed defendant a printed copy of the Miranda rights. While reading aloud, defendant paused at the word "coercion." Detective Nelson explained that defendant was not "forced" or "pressured" to speak with them. Defendant then signed the Miranda waiver form.

Detectives informed defendant they "just had a couple of questions . . .

and see if you can kinda help us out, see what's going on here." Defendant responded "[n]ot a problem." Asked about the decedent, defendant stated, "I don't know him personally, but yes, I know of him." As the questioning proceeded, defendant confirmed he had lived on the same block as Clark in 2014 but that he had "no personal issues with him."

The detectives pressed, noting that on September 5, 2018, Clark had uploaded to Facebook a copy of a cooperation agreement with the HCPO signed by defendant. In the Facebook post, Clark accused defendant of being a "rat." Defendant claimed not to have taken Clark's post "personally" because "[t]his is what's going on with everybody" and the "rumors [were] already out." Defendant further noted Clark had confronted him about the cooperation agreement two years earlier, in 2016.

Detectives challenged defendant, stating "there's no way you do not take it personal. You have to take it personal at this point 'cause now he's putting your life in jeopardy." Ultimately, defendant said "I agree. I agree. I agree. It does take it to another level." He elaborated:

> DEFENDANT: My, my mindset was already different. My mind - I was already…
>
> DETECTIVE NELSON: Yeah, it was, it was . . .
>
> DEFENDANT: . . . on my toes.

5

DETECTIVE NELSON: Right. You were on your toes, right? You, you was, you was on your toes. But September 5th, motherfucker, you was on your pinky toe. You was at another level. Trust what I'm telling you. I know that. You can't deny that. This changes the game. All that talk and rumors, yah, ba, ba, ba, ba. But when motherfuckers see pictures of, of, of reports and all - come on. It's through the roof because not only does it affect you, it affects your kids . . . .

Having addressed motive, detectives shifted their focus to defendant's whereabouts on the night of the murder. Defendant gave conflicting accounts, ultimately acknowledging he had not been "exactly truthful with [the detectives]." Approximately two hours into the interrogation, detectives made a series of statements to defendant, directly accusing him of the homicide.

DETECTIVE GREEN: You tried to play God last week.

DEFENDANT: No, I didn't.

DETECTIVE GREEN: You went in there and you, you said, I'm God tonight. And you shot that man in his car. No other way around this, man. You gotta tell your story before it's just too late.

UNIDENTIFIED DETECTIVE: What's up?

DEFENDANT: Can I go home to my kids?

UNIDENTIFIED DETECTIVE: I didn't hear what you said, bru.

6

DEFENDANT: Said, can I go home to my kids? What's going on?

UNIDENTIFIED DETECTIVE: You may not be going home. You understand? You may not be going home. They been here for three hours trying to get you to <u>help yourself</u> and <u>you don't wanna help yourself</u>. So you may not be going home. You understand? Bruh, Mike, you understand?

DEFENDANT: I understand what you saying.

UNIDENTIFIED DETECTIVE: Okay. But it's not working. They giving you a lot, right? And you ain't giving them nothing back. They trying to help you but you ain't willing to help yourself. So you putting me on the spot now. I gotta make a decision. And you know I change lives, right? I change lives.

DEFENDANT: I don't, I don't know you, so.

UNIDENTIFIED DETECTIVE: Nope. Well, you don't have to know me. But believe it or not, I will change your life. Don't sit here and waste people time. They trying to help you. So help yourself. No?

[Emphasis added.]

Defendant pressed his request to go home.

DEFENDANT: (Unintelligible) go home?

UNIDENTIFIED DETECTIVE: You asking me?

DEFENDANT: Yeah.

UNIDENTIFIED DETECTIVE: Nah. You ain't give me a reason for you to go home. I haven't heard one

7

thing. I heard a bunch of lies earlier. That's not enough for you to go home. Give me a reason. Give me a reason for me to stay here another hour. Give me a reason. Stop being selfish.

Defendant did not confess.

UNIDENTIFIEED DETECTIVE: What's the deal, man? Mike, listen. You, you been here couple of times. You listening?

DEFENDANT: Yeah, I'm listening, but I don't, I don't got nothing else to say, man. Just get in contact with Ashley so I can get outta here. Fuck.

Notwithstanding this and other requests to end the interrogation, the detectives did not stop. Approximately seventy-five minutes following defendant's request to "get in contact with Ashley" so he could "get outta here," detectives provided defendant with water and coffee and told him to "knock if [he] need[ed] anything." Defendant was confined to the room for twenty-three minutes as they prepared a complaint for murder and weapons offenses.

Eyewitness Statement

On the day of defendant's interrogation, detectives interviewed Eva Reid, a witness who had been sitting on her porch across from Brenda's bar on the night of the shooting. Reid told detectives she saw a tall, slender man with dark clothing run toward Clark's car, fire four shots, and then run away. Reid said her vision "was blurry, because [she] was drinking and smoking." The following

8

exchange then occurred:

> DETECTIVE NELSON:  So you could see his hair?  He or she.
>
> REID:  No.  But I know that it wasn't no dreads or nothing.  It was no dreads, no hair.  It was like, like wavy like.
>
> DETECTIVE NELSON:  But can you confirm that, though?
>
> REID:  No.  But I . . .
>
> DETECTIVE NELSON:  You can't confirm that?
>
> REID:  No.  But I know that it wasn't no dreads.  I know that he didn't have no hair.
>
> DETECTIVE NELSON:  Can you confirm that?  You just told me that it was blurry.  So the only thing . . .
>
> REID:  Yeah.
>
> DETECTIVE NELSON:  . . . you can confirm right now, you said was . . .
>
> REID:  Is dark clothes.
>
> DETECTIVE NELSON:  . . . is dark clothes.  You're positive about dark clothes.
>
> REID:  Yes.  I'm positive about that.
>
> DETECTIVE REID:  But pertaining to hair and any other thing, can you truly say . . .

9

REID: I know he was tall.

[Emphases added.]

Reid's statement as to the shooter not having dreads, or dreadlocks, was significant, as defendant wore dreadlocks on the day of the homicide and the date of arrest.

While defendant was still in custody, detectives brought back Reid for a second interview. They showed her footage from the time of the shooting captured by a camera located near the crime scene on New Street.

> DETECTIVE NELSON: Can you, just based on just this description right here, the description earlier was dark clothing.
>
> REID: Right.
>
> DETECTIVE NELSON: Tall male.
>
> REID: Right.
>
> DETECTIVE NESON: Is this what you saw leaving the area?
>
> REID: Mm. Not that dark clothing, I mean, this - not this clothing right here.
>
> . . . .
>
> DETECTIVE NELSON: So I'mma [sic] show you another video. You know what? I'm gonna go up a little bit further. Right now it's showing 42:30, which is

10

actually hour and 30 minutes 25 slow. You see him running.

REID: Mm-hmm, mm-hmm. But he don't have that same hoodie on, though.

Detective Nelson showed Reid another video from a different angle in which the same individual, who detectives believed to be defendant, was present. Once more, Reid qualified her identification. Defense counsel's attempt to exploit inconsistencies in Reid's description of the suspect's hair and incongruent video footage was later disallowed by the trial court.

Indictment

In December 2018, a Hudson County grand jury billed an indictment against defendant, charging him with first-degree murder, N.J.S.A. 2C:11-3(a)(1) to (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); and second-degree certain person not to have weapons or ammunition, N.J.S.A. 2C:39-7(b)(1).

Miranda Hearing and Wade Application

Defendant moved to suppress the statement he had made to detectives. The motion court held a Miranda hearing in June 2019. The State did not contest that defendant was in custody while questioned at the Homicide Unit. Detective

Nelson was the sole witness to testify. He was asked whether defendant was a target when brought to the Homicide Unit:

> DETECTIVE NELSON: Target? I would — I just know he was a person of interest. I wouldn't say target.
>
> DEFENSE COUNSEL: He was —
>
> DETECTIVE NELSON: I was still unsure.
>
> DEFENSE COUNSEL: — a person of interest as a shooter in an open homicide investigation, right?
>
> DETECTIVE NELSON: Yes.

In a written order dated July 12, 2019, the motion court denied defendant's motion to exclude his statement. The motion court did not articulate a finding about whether defendant had gone voluntarily to the station, nor did the court make findings about Detective Nelson's general credibility. The court found that defendant was in custody only when the detectives told him "[y]ou ain't give me reason for you to go home" more than halfway into the interview. The court was satisfied that the State had established beyond a reasonable doubt "that the suspect's waiver was knowing, intelligent[], and voluntary in light of all the circumstances." In particular, the motion court found that defendant's reply of "Mm, cool" signified he was willing to talk to the police, and his later response "Not a problem" resolved any possible ambiguities concerning his initial

12

utterance.  The motion court further found that the implied threat that defendant would be retaliated against as a result of the murder did not rise "to the level of very substantial psychological pressure that would be necessary to overbear [d]efendant's will and render his subsequent statement involuntary."  In this context, the motion court observed that the police had not threatened defendant.  They were instead "promis[ing] that [d]efendant would be safer if he cooperated . . . ."

In assessing "the totality of the circumstances surrounding the elicitation of [d]efendant's statement to police," the motion court noted that "[d]efendant had previous experience talking to police as a witness."  The motion court found that "[i]t does not appear that the interview was conducted in conditions that would overbear his will, as he was provided with water and breaks.  Under these circumstances, the vast majority of the interview suggests that this statement was elicited voluntarily."  In exception to these findings, the motion court found:

> towards the end of the interview, [d]efendant asked the detectives, "Can I go home to my kids?"  However, instead of clarifying if [d]efendant is seeking to assert his right to remain silent, the detectives proceed to tell him he may not be going home tonight, and that he should stop being selfish and what was best for his children by cooperating with the police.

As noted above, at this point, one of the detectives replied, "Nah.  You

13

ain't give me reason for you to go home." Regarding this exchange, the court found that:

> defendant was in custody, and clearly subject to interrogation, so his Miranda rights were implicated. In context, this appears to have been in response to one of the detectives telling [d]efendant, "I wanna go home, man. And I know you wanna go home, too. Let's go." Therefore, this does not appear to be an attempt to terminate questioning so much as an inquiry in response to the detective's previous statement. Defendant continues to respon[d] to the detectives' questioning, albeit curtly, but the [c]ourt cannot conclude that this amounted to an unambiguous or ambiguous attempt to cut of[f] questioning.

Consequently, defendant's recorded statement, without any redaction, was admitted in evidence and heard by the jury.

In addition to its Miranda ruling, the motion court granted defendant's application for a Wade/Henderson hearing with respect to Reid's identification. United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 308 (2011). However, a full hearing was not conducted as Reid was never called to testify at trial.

At trial, the State introduced defendant's full recorded statement to the police. While Reid was not called to testify, the jury heard Detective Nelson refer to her in the abstract, stating to defendant, "You might have almost snuck away with this one. But that good ol' witness right there on New Street. How

do you explain that?" On cross-examination of Nelson, defense counsel attempted to elicit Reid's identification of the perpetrator as a man with "no dreads." The State objected on hearsay grounds. Defense counsel explained he was not offering Reid's statements to "prove that the shooter in fact didn't have dreadlocks" but rather to demonstrate that Nelson was "put on notice, and he [failed to] investigate anybody without dreadlocks." Ultimately, the trial court sustained the State's objection. Neither was defense counsel permitted to demonstrate how detectives attempted to rehabilitate Reid's description to conform to her later positive identification.

In its closing argument, the State commented on defendant's silence at various times during the interrogation, telling the jury that defendant "doesn't respond [to the detective's questions] because he knows the evidence is there. He knows that you can see it with your own eyes."

After testimony and closing arguments, the trial court administered the jury charge. Upon return of guilty verdicts on murder and weapons counts, the court prepared the jury to deliberate on the certain-persons charge, instructing the jury that defendant was guilty if: (1) "there was a weapon"; and (2) he knowingly possessed "the weapon." Defendant stipulated to his two predicate convictions for possession with intent to distribute within a 1,000 feet of school

property in violation of N.J.S.A. 2C:35-7(1). Notwithstanding this stipulation, the court read aloud the charges for which defendant had been previously convicted with specificity, rather than generically. In its closing remarks, the State repeated the specified charges forming the basis of defendant's predicate convictions.

Defendant was convicted on all four counts of the indictment. The trial court sentenced defendant to an aggregate term of thirty-five years' imprisonment, all to be served without eligibility for parole. Specifically, the court merged the convictions for murder and possession of a weapon for unlawful purpose. The court sentenced defendant to a thirty-year term for murder concurrent to a ten-year term for the conviction for unlawful possession of a weapon. The court also imposed a consecutive five-year term without parole for the certain-persons conviction. The court denied the State's application to impose an extended term sentence.

II.

Defendant advances five arguments on appeal.

POINT I

THE ADMISSION OF DEFENDANT'S POLICE STATEMENT VIOLATED HIS RIGHTS AGAINST SELF-INCRIMINATION AND TO DUE PROCESS.

16

A. Defendant's Statement and Motion Court's Decision

    1. Defendant's Statement

    2. Motion Court's Decision

B. Defendant Was in Custody Throughout the Stationhouse Interrogation.

C. The Detectives Repeatedly Ignored Defendant's Invocations of His Right to Silence.

D. Defendant's Miranda Waiver and Statement as a Whole Were Not Voluntary.

E. The Erroneous Admission of Defendant's Statement Was Not Harmless.

POINT II

THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL BY FAILING TO REDACT OR CORRECT SEVERAL INADMISSIBLE PORTIONS OF HIS POLICE STATEMENT. (Partially Raised Below)

A. The Detectives' False Claims that a NonTestifying Eyewitness "Picked" Defendant — and the Trial Court's Refusal to Permit Him to Impeach that Identification — Violated His Confrontation Rights.

B. Permitting the Jury to Hear Defendant's Multiple Invocations of His Right to Silence — and the Prosecutor's Comments on His Silence — Denied Him a Fair Trial.

C. The Detectives' Improper Lay Opinions — on Defendant's Guilt, Credibility, Motive, Opportunity,

17

and Premeditation — Usurped the Jury's Exclusive Role to Decide the Ultimate Issue.

POINT III

DEFENDANT'S CERTAIN-PERSONS CONVICTION MUST BE REVERSED DUE TO ERRONEOUS JURY INSTRUCTIONS AND IMPROPER ARGUMENT. (Not Raised Below)

A. The Trial Court's Erroneous Jury Instructions on Two Elements of the Certain-Persons Offense Require Reversal.

B. The Trial Court's and Prosecutor's Disclosure of the Nature of Defendant's Predicate Convictions Denied Him a Fair Trial on the Certain-Persons Count.

POINT IV

THE CUMULATIVE EFFECT OF THE NUMEROUS TRIAL ERRORS REQUIRES REVERSAL. (Not Raised Below)

POINT V

DEFENDANT'S CONSECUTIVE SENTENCES VIOLATE YARBOUGH AND REQUIRE A RESENTENCING.

Defendant's Statement to Police

"[W]ith respect to legal determinations or conclusions reached on the basis of the facts," our review is plenary. State v. Stas, 212 N.J. 37, 49 (2012) (citing State v. Handy, 206 N.J. 39, 45 (2011)). By comparison, the trial court's

18

factual findings from the suppression hearing on defendant's self-incrimination claims are reviewed under a deferential standard. See State v. Tillery, 238 N.J. 293, 314 (2019); State v. Hubbard, 222 N.J. 249, 262-65 (2015). Due to the judge's "expertise in fulfilling the role of factfinder," this deference extends to the judge's determinations when based on live, as well as video or documentary evidence. State v. S.S., 229 N.J. 360, 364-65 (2017). We will not reject the trial court's factual findings merely because we "disagree[] with the inferences drawn and the evidence accepted by the trial [judge] or because [we] would have reached a different conclusion." Id. at 374. Only if the judge's factual findings are "so clearly mistaken that the interests of justice demand intervention and correction" will we discard those factual findings. State v. Gamble, 218 N.J. 412, 425 (2014) (citation omitted).

When the judge's factual findings are "not supported by sufficient credible evidence in the record," the reviewing court's deference ends. S.S., 229 N.J. at 381. Then, the court's interpretation of the law and "the consequences that flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425. Thus, "[w]hen faced with a [challenge to a] trial [judge]'s admission of police-obtained statements, [we] engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State

19

v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). "Subject to that caveat, [we] generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019).

Defendant urges us to rule defendant's entire statement inadmissible. He argues that in their interrogation, detectives contradicted the Miranda warnings, affirmatively misled defendant about his suspect status, threatened his life, and exploited his children.

> [They] promised leniency, falsely urged [defendant] to "help" himself, and fabricated eyewitness evidence. They swore and shouted at him; called him a "motherf***er"; and physically intimidated him by pointing at him, leaning toward him, and slapping the table. And they repeatedly ignored his invocations of his right to silence and twice conditioned his freedom on him cooperating. As a result of those psychologically coercive tactics, [defendant's] Miranda wavier and statement as a whole were involuntary and should have been suppressed in full.

Having undertaken a "searching and critical" review of the record, we cannot defer to the motion court's findings of fact or conclusions of law. Hreha, 217 N.J. at 381-82. We acknowledge in undertaking its analysis, the motion court engaged in a thoughtful assessment of pertinent case law, beginning with Miranda and its progeny. However, the motion court's premise in applying that

20

case law rested on a finding that defendant was not in custody until the last minutes of the interrogation, a position that neither the State nor the defense adopted at the <u>Miranda</u> hearing.  That oversight irredeemably taints the motion court's findings.

Here, the record establishes that defendant was in custody from the inception of his confinement to a small interview room from which he did not depart, apart from bathroom breaks upon request, over a seven-hour period.  Throughout questioning, detectives were seated by the single door to the interview room.  Although Detective Nelson characterized defendant as a "person of interest," defendant was clearly more than that; he was a suspect.  During defendant's interrogation, detectives were at the ready with information to challenge defendant's responses, leading to contradiction, equivocation, and invocations of silence by defendant.

Detectives began the interrogation with a falsehood, telling defendant that "Just like, you know, anybody else that come down here, we gotta read you your rights and things like that."  In the course of this very investigation, this statement proved false, as for instance, Reid was not Mirandized.  However, this misrepresentation by itself does not render defendant's subsequent statements less than voluntary.  Although officers "should scrupulously avoid making

comments that minimize the significance of the suspect's signature on that card or form," Tillery, 238 N.J. at 319, the detective's first comment, that the Miranda warnings were equivalent to a formality for all, could be overlooked as an offhand remark that simply preceded the warnings that defendant said he understood and waived. See State v. O.D.A.-C., 250 N.J. 408, 422 (2022) (explaining that courts consider the totality of circumstances to decide whether the State met its burden in proving validity of a waiver); State v. Cooper, 151 N.J. 326, 355 (1997) ("[M]isrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge.").

It is the combination of the detectives' repetitive, misleading statements and actions that lead us to hold defendant's statement should not have been admitted as evidence. For example, our review of the video record confirms that in the course of interrogation, various detectives slammed the table, raised their voices, and cursed at defendant.

Critically, detectives told defendant to "help [him]self" by answering their questions. Detectives claimed, "I wanna help you. We all wanna help you." In "trying to help [him]," detectives said they would treat defendant more leniently, unlike "other people," meaning suspects. In State v. ex rel. A.S., our Supreme Court held that "the interrogating officer violated a juvenile defendant's rights

by telling her that answering questions 'would actually benefit her'—an assertion at direct odds with the Miranda warning 'that anything she said in the interview could be used against her in a court of law.'"  203 N.J. 131, 151 (2010). Similarly, in State v. Puryear, the interrogating officer told the defendant "[t]he only thing you can possibly do here is help yourself out.  You cannot get yourself in any more trouble than you're already in.  You can only help yourself out here." 441 N.J. Super. 280, 288 (App. Div. 2015).  We found the defendant's ensuing statement inadmissible because the detective's representation had neutralized the Miranda warning and the defendant therefore had not knowingly, intelligently, and voluntarily waive his Miranda rights.  Id. at 298-99.

It is well settled that "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other."  Id. at 296-97 (quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003)).  For example, "telling a defendant 'it would be worse' if he did not answer questions contradicted the Miranda safeguards."  Id. at 297.  The courts in A.S. and Puryear both held the defendants' statements inadmissible because the interrogating officers had contradicted the Miranda warnings by misleading defendants into believing their statements would help them and would not be used against them.  See id. at 298-99; A.S., 203 N.J. at 151 (holding that the

A-1013-22

detective telling the defendant that answering his questions would show that the defendant was a "good person" contradicted the <u>Miranda</u> warnings).

However, in <u>Pillar</u>, where a defendant admitted to a crime based on the interrogating officer's assurance that their conversation was off the record, we observed that "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." 359 N.J. Super. at 269 (quoting <u>Cooper</u>, 151 N.J. at 355). "A court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." <u>L.H.</u>, 239 N.J. at 45 (quoting <u>Hreha</u>, 217 N.J. at 383). "[W]here a promise is likely to 'strip[] defendant of his "capacity for self-determination"' and actually induce the incriminating statement, it is not voluntary." <u>State v. Fletcher</u>, 380 N.J. Super. 80, 89 (App. Div. 2005) (quoting <u>Pillar</u>, 359 N.J. Super. at 272-73). As Justice Albin explained in <u>L.H.</u>, while certain lies told by interrogating officers are tolerated, inducements to speak to law enforcement that include express or implied assurances of leniency cannot be tolerated. Specifically, he stated:

> Because a suspect will have a natural reluctance to furnish details implicating himself in a crime, an interrogating officer may attempt to dissipate this reluctance and persuade the suspect to talk. One permissible way is by appealing to the suspect's sense of decency and urging him to tell the truth for his own

sake.  Our jurisprudence even gives officers leeway to tell some lies during an interrogation.

Certain lies, however, may have the capacity to overbear a suspect's will and to render a confession involuntary.  Thus, a police officer cannot directly or by implication tell a suspect that his statements will not be used against him because to do so is in clear contravention of the Miranda warnings.

. . . .

Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will. A free and voluntary confession is not one extracted by threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.

. . . .

Under the totality-of-the-circumstances test, a promise of leniency is one factor to be considered in determining voluntariness.  Courts have recognized that the danger posed by promises of leniency is that such promises in some cases may have the capacity to overbear a suspect's will and produce unreliable— even false—confessions.  Some courts also take into account an interrogator's minimization of the offense when questioning the suspect as one factor in determining the voluntariness of a confession.

[239 N.J. at 43-46 (citations and internal quotation marks omitted).]

Applying these controlling principles to defendant's contentions on appeal, we conclude that the court erred by admitting into evidence defendant's statement to police. The statement was obtained after the interrogating detectives repeatedly told defendant that he could help himself by admitting his role in the murder. These statements effectively "contradicted the Miranda warnings provided to [defendant]: that anything [he] said in the interview could be used against [him] in a court of law." A.S., 203 N.J. at 150.

Although defendant ultimately maintained his innocence, the detectives' representations that defendant could help himself by talking to them combined with prejudicial accusations of guilt, led to defendant both conceding incriminating details and invoking silence—the latter also impermissibly shown to the jury and referenced by the State in its closing argument. Ibid.; L.H., 239 N.J. at 43-46. Under these circumstances, the statement should not have been admitted in evidence because the actions and statements of the detectives rendered meaningless defendant's initial waiver of his Miranda rights.

And there are other problems with the interrogation, which, had we not found as we do that the statement in its entirety should not have been admitted, would have required numerous redactions of its recording.

Well-established jurisprudence bars the admission into evidence of police officers' opinions as to a defendant's "truthfulness [or] guilt." State v. C.W.H., 465 N.J. Super. 574, 593-94 (App. Div. 2021) (citing State v. Tung, 460 N.J. Super. 75, 101 (App. Div. 2019)). Such opinions by detectives are "particularly prejudicial because [a] jury may be inclined to accord special respect to such a witness" and give such testimony "almost determinative significance." Id. at 593 (citation omitted). Where police opinions are admitted via a recorded interview, "[a]t a minimum" courts should instruct that the opinions "should not be deemed testimony and may be considered only in the context of understanding how the interrogation was conducted and how defendant responded." State v. Cotto, 471 N.J. Super. 489, 540 (App. Div. 2022). The record shows continuous accusations by interrogating detectives as to their belief in defendant's guilt and his need to confess – all of which were played for the jury. No curative limiting instruction was administered by the trial court.

Because we hold defendant's statement inadmissible in its entirety for combined reasons, we have not specifically determined when defendant definitively invoked his right to silence. Irrespective of our broader holding, the recording of the interrogation contained extended pauses during defendant's interrogation, lasting between thirty and ninety seconds, followed by detectives

commenting on defendant's silence and urging him to say something. Even if not permanent, those extended periods of silence during the interrogation should have been redacted. Redaction is necessary because otherwise the jury may draw "impermissible inferences" about the defendant's guilt "that could undermine a defendant's fundamental right to a fair trial." State v. Feaster, 156 N.J. 1, 76 (1998).

For all of those reasons, we are convinced the admission of the recording of the police interrogation of defendant violated defendant's right against self-incrimination and his due-process rights. Accordingly, we vacate the judgment of conviction in its entirety.

In the interest of completeness, we address defendant's remaining arguments to determine whether additional grounds for vacatur of the convictions exist.

Certain-Persons Charge

Defendant argues and the State concedes the trial court erroneously instructed the jury that defendant must be convicted if (1) "there was a weapon" and (2) he knowingly possessed "the weapon." As correctly observed, the certain-persons offense, N.J.S.A. 2C:39-7(b)(1), specifically proscribes possession of a "firearm" for certain-persons. However, in conceding this point,

the State maintains that defendant's failure to object to the charge at trial permits an inference that the error was not prejudicial.

In reviewing jury instructions, our jurisprudence recognizes that "[a]ppropriate and proper charges are essential for a fair trial.'" State v. Reddish, 181 N.J. 553, 613 (2004) (quoting State v. Green, 86 N.J. 281, 287 (1981)). In determining whether a charge was proper, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422 (1973) (citing State v. Council, 49 N.J. 341 (1967)). Further, when reviewing a jury instruction for plain error, "failure to object points up the fact that experienced counsel did not consider that the use of the words detracted from the clear meaning which the charge as a whole conveyed." Ibid.

Here, the trial court read the instruction for the certain-persons charge using the terms weapon and firearm interchangeably as follows:

> Count 4 charges the defendant with possession of a firearm by a previously convicted person. You must disregard completely your prior verdict and consider anew the evidence previously admitted on possession of a weapon.
>
> . . . .
>
> In order for you to find the defendant guilty [of the certain-persons offense], the State must prove each of

the following elements beyond a reasonable doubt. Number one, that there was a <u>weapon</u>. Number two, that the defendant purchased, owned, possessed or controlled the <u>weapon</u> on September 23rd, 2018.

. . . .

So, a person who possesses a <u>firearm</u> must know or be aware that he possesses it, and he must know what it is that he possesses or controls, that it is a <u>firearm</u>.

. . . .

A person may possess a <u>firearm</u> even though it was not physically on his person at the time of arrest.

[(Emphases added).]

We consider the charge as a whole in relation to the wording of the certain-persons offense as charged in the indictment, which reads:

MICHAEL T. WEATHERSBEE JR., having been convicted of the crime of Possession with Intent of a Controlled Dangerous Substance while within 1000 feet of a School, did purchase, own, possess or control a <u>handgun</u>, contrary to the provisions of N.J.S.A. 2C:39-7(b)(l).

[(Emphasis added).]

From this, it is clear that to the jury the term "weapon" referred to "firearm." In addition, the definition of a weapon entails a firearm: "'[w]eapon' means 'anything readily capable of lethal use or of inflicting serious bodily injury.'" N.J.S.A. 2C:39-1(r). Defendant's failure to raise this issue to the trial

30

court further evidences that the use of the term weapon did not "detract[] from the clear meaning which the charge as a whole conveyed." See Wilbely, 63 N.J. at 422. Accordingly, we conclude that the trial court's use of the term "weapon" in its certain-persons jury instructions do not require reversal of the certain-persons offense under the plain error standard.

Defendant also argues for the first time on appeal that the trial court's disclosure of the nature of defendant's predicate convictions to the jury, as highlighted by the State in its closing, denied him a fair trial. The State contends that defendant's failure to object permits an inference that the error was not unduly prejudicial. R. 2:10-2.

Defendant stipulated to his two prior convictions for possession of a controlled dangerous substance with intent to distribute within 1,000 feet of a school, N.J.S.A. 2C:35-7, constituting predicate offenses under the certain-persons statute, N.J.S.A. 2C:39-7(b)(1). Despite the stipulation, the trial court specifically referenced the offenses and dates of defendant's convictions in its final instructions. Compounding that error, the State highlighted defendant's convictions with particularity in summation.

Regarding this issue, the Bailey Court held:

> If a defendant chooses to stipulate, evidence of the
> predicate offense is extremely limited: "[t]he most the

31

jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that . . . bar a convict from possessing a gun[.]" <u>Old Chief v. United States</u>, 519 U.S. 172, 191–92 (1997). A defendant who stipulates can therefore prevent the State from presenting evidence of the name and nature of the offense. Provided that the stipulation is a knowing and voluntary waiver of rights, placed on the record in defendant's presence, the prosecution is limited to announcing to the jury that the defendant has committed an offense that satisfies the statutory predicate-offense element.

[<u>State v. Bailey</u>, 231 N.J. 474, 488 (2018) (citations reformatted).]

The jury heard not only "that the conviction admitted by defendant falls within the class of crimes" but needlessly learned the specific nature of the crimes and the dates of the offenses in direct contravention of established case law. <u>See</u> <u>ibid.</u> Thus, the trial court's and the State's specific references to defendant's prior convictions constituted plain error, clearly capable of producing an unjust result. The references to the predicate acts constitute an independent basis to vacate the certain-persons conviction.

<u>The State's Comments on Defendant's Silence</u>

The State commented on defendant's extended silences during the interrogation without a curative charge from the trial court. During summation, the State said:

> You saw the defendant's statement, two-and-a-half hours. He's asked directly by the detectives, "Did you run because you heard gunshots?" He doesn't even respond. He doesn't respond, because he knows the evidence is there. He knows that you can see it with your own eyes. He doesn't want to admit that this is him. Don't worry about it; the evidence does that for us.

It is well-established that "[o]ur state law privilege does not allow a prosecutor to use at trial a defendant's silence when that silence arises 'at or near' the time of arrest, during office interrogation, or while in police custody." State v. Muhammad, 182 N.J. 551, 569 (2005). Defendant's extended periods of silence during the interrogation and the detective's comments about them should have been redacted. The State's comments on defendant's silence during its summation compounded that error. Permitting the State in this instance to comment as it did was unduly prejudicial and constituted plain error. R. 2:10-2.

Limitation of Cross-Examination

As mentioned, through Detective Nelson's questioning during interrogation, the jury heard of Reid's purported identification of defendant as the perpetrator: "But that good ol' witness right there on New Street. How do you explain that?" The jury heard a total of seven references by detectives

during the interrogation in which Reid, directly or by inference, incriminated defendant.

As defendant observes on appeal, "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v. Branch, 182 N.J. 338, 350-51 (2005) ("[A] police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant."). Because "[a] defendant exercises his right of confrontation through cross-examination," disallowing cross-examination on this point was another error that deprived defendant of a fair trial. Id. at 348.

\*

In sum, the court erred in admitting defendant's statement in evidence, improperly curtailing defense counsel's cross-examination of Detective Nelson, permitting the State to refer to defendant's silence, and improperly charging the jury as to the certain-persons offense by referencing the predicate acts. As we have held, some of these errors individually require vacatur of the convictions. Collectively, they require it. See State v. Weaver, 219 N.J. 131, 161 (2014) (applying the cumulative-error doctrine where the impact of multiple errors is

not harmless). Therefore, we vacate the judgment of conviction and remand the case for a new trial. Because we vacate the convictions, we do not address defendant's argument regarding the sentence.

Vacated and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1013-22